# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2017-CA-00043-COA

**REINALDO BACALLAO**                                                          **APPELLANT**

**v.**

**MADISON COUNTY, MISSISSIPPI**                                                **APPELLEE**

DATE OF JUDGMENT:              12/15/2016
TRIAL JUDGE:                   HON. BETTY W. SANDERS
COURT FROM WHICH APPEALED:     MADISON COUNTY CIRCUIT COURT
ATTORNEYS FOR APPELLANT:       MICHAEL J. MALOUF
                               ROBERT EUGENE JONES II
ATTORNEY FOR APPELLEE:         KATHERINE BRYANT SNELL
NATURE OF THE CASE:            CIVIL - TORTS - OTHER THAN PERSONAL
                               INJURY AND PROPERTY DAMAGE
DISPOSITION:                   AFFIRMED - 01/09/2018
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**EN BANC.**

**CARLTON, J., FOR THE COURT:**

¶1.     On March 22, 2012, Reinaldo Bacallao filed a complaint against Madison County,

Mississippi, and Attorney Lisa M. Ross, individually, alleging Ross committed legal

malpractice while acting as Bacallao's public defender.  After a trial, the county court, sitting

without a jury, found that Bacallao failed to provide sufficient proof to show that Ross had

committed malpractice.  Bacallao appealed the county court's decision to the Madison

County Circuit Court, which affirmed.

¶2.     Bacallao appeals and asserts the following assignments of error: (1) the county court

applied an erroneous legal standard; (2) the county court's finding were against the

overwhelming weight of the evidence; (3) the county court erred in excluding exhibit 31 from evidence; and (4) the county court erred in failing to consider and award sanctions against Madison County.

¶3. Upon reviewing the record, we find no error. Accordingly, we affirm the circuit court's judgment.

## FACTS AND PROCEDURAL HISTORY

¶4. On March 3, 2010, a Madison County grand jury indicted Bacallao and his companion, Oneida Gamez, on charges of arson, conspiracy to commit arson, and insurance fraud.[1] Bacallao and Gamez attempted to retain Michael J. Malouf Jr. to defend them. Malouff entered an appearance on their behalf.

¶5. The record reflects that three months later, Malouf filed a motion to withdraw as counsel for Bacallao and Gamez, explaining that they were indigent and made no payments toward their representation. Malouf asked that the court permit him to withdraw as counsel and that a public defender be appointed to represent Bacallao and Gamez. Thereafter, both Bacallao and Gamez filed affidavits of indigency with the court. A status conference was held on September 27, 2010, where Malouf presented his motion to withdraw, and the court entered an order permitting Malouf's withdrawal. The court subsequently entered an order

_____

[1] The record shows that three different houses owned by Bacallao and Gamez have suffered fire damage since 2001. In 2006, after Bacallao and Gamez's house suffered fire damage, Bacallao filed suit against his insurance company, Nationwide Property and Casualty Insurance Company, to recover insurance benefits. The record contains the transcript of Bacallao's deposition taken in November 2007 as a result of that lawsuit. The deposition transcript shows that Bacallao was deposed in English. However, the arson, conspiracy-to-commit-arson, and insurance-fraud charges from which the present case stems are the result of a separate 2009 house fire.

appointing a public defender to represent Bacallao and Gamez.

¶6. The record reflects that Ross was appointed as Bacallao's public defender around November 4, 2010. Ross testified that on the same date she received the order assigning Bacallao's case to her, she drafted and filed a motion for discovery. Ross testified that on November 23, 2010, she copied all of the information that she had received from the district attorney's office, including the order setting forth his court dates, as well as other discovery, and sent copies to Bacallao. The record reflects a dispute at trial as to whether the order resetting the hearing and the new trial dates were included in the copy of discovery mailed to Bacallao.

¶7. The record shows that in November 2010, Gamez attempted to contact Ross on Bacallao's behalf. Bacallao testified at trial that Gamez contacted Ross on his behalf because he is unable to communicate well in English.

¶8. Bacallao's case was scheduled for a status conference on January 31, 2011. Ross testified that on January 28, 2011, three days prior to the status conference, she called Bacallao twice to inform him that his presence was required at the status conference. Ross stated that she did not speak to Bacallao, but she left a voicemail instructing him that his status conference was set for January 31, 2011, and if he failed to attend, a bench warrant would be issued for his arrest. Evidence presented at trial reflects that Bacallao accessed his voicemail within a minute of Ross calling and leaving him a message.

¶9. The record reflects that Bacallao failed to attend the status conference on January 31, 2011. As a result, a bench warrant was issued for his arrest. Ross sent Bacallao a letter to

3

inform him that a bench warrant had been issued due to his failure to appear in court. Bacallao was arrested on February 16, 2011, at the Madison County Detention Center. The record reflects that Bacallao spent approximately seventy-eight days in jail, until his release on May 5, 2011.

¶10.    While Bacallao was detained, his sister-in-law, Elizabeth Silva,[2] contacted Ross. Silva testified that Ross was not helpful and would not speak to her regarding Bacallao's incarceration. According to Silva, Ross stated that Bacallao would have to remain in jail until his trial. Bacallao's family subsequently retained Malouf for private representation.

¶11.    Malouf filed a motion to reinstate bond, and after a hearing on the motion, the county court ordered that Bacallao be released from custody. The Malouf firm investigated the criminal charges and hired an independent fire expert. A nolle prosequi was entered on Bacallao's case on June 22, 2011, and the criminal indictment against Bacallao was dismissed.

¶12.    Thereafter, Bacallao filed a civil complaint in county court against Ross and Madison County, alleging that Ross committed legal malpractice. In his complaint, Bacallao specifically alleged that Ross's "wrongful, careless, negligent and reckless actions and inactions constitute legal malpractice; breach of the duty of care; and breach of the duty of loyalty." As a result, Bacallao claimed that he was entitled to an award of damages. Bacallao further alleged that Ross's "actions and inactions evince malice, gross negligence, and/or willful, wanton, or reckless disregard for [Bacallao's] rights entitling [Bacallao] to an

_____

[2] The appellant's brief refers to Bacallao's sister-in-law as "Elizabeth Bacallao"; however, the trial transcript refers to her as Elizabeth Silva.

4

award of punitive damages in addition to compensatory damages."

¶13. A trial was held on May 27 through May 29, 2014. At trial, the county-court judge heard testimony from Bacallao, Gamez, Silva, and Ross. The county-court judge also heard testimony from Madison County's expert witness, Barry Ford, whom the defense tendered, and the county court accepted, as an expert in the legal field, specifically with regard to client communications and representation.

¶14. During trial, Bacallao's counsel moved to have a set of Ross's letters admitted into evidence as exhibit 31 in order to show Ross's usual and customary practice regarding initial correspondence with criminal-defense clients. Defense counsel objected to the admission of these letters, arguing that the letters relate to clients previously represented by Ross and that the clients are unrelated to the case against Bacallao. Defense counsel also objected on the grounds that Bacallao's counsel produced the letters approximately a week before trial, and well past the discovery period. The county-court judge ruled that the letters would not be allowed into evidence, explaining to Bacallao's counsel that it "has been well established" that Ross normally provides her clients with a letter containing their court dates, but failed to provide Bacallao a letter containing his court dates.

¶15. After the trial, the county-court judge found that Bacallao failed to prove by a preponderance of the evidence that Ross committed legal malpractice. The county court judge entered an order stating as follows:

> The proof shows and the [c]ourt finds that Ross did communicate or attempt to communicate with [Bacallao] at least four times subsequent to her assignment to the case: 1) on or about November 23, 2010, Ross sent to [Bacallao] a packet of information which included, among other things, a

5

cover letter asking [Bacallao] to contact her; 2) Ross placed a phone call to the phone number [Bacallao] provided to the [c]ourt on January 28, 2011, which went unanswered; 3) Ross made a second phone call to [Bacallao] cell phone on January 28, 2011, which also went unanswered and left a voice message requesting Plaintiff contact her and reminding him of [c]ourt on January 31, 2011; and 4) Ross sent a letter to [Bacallao] on January 31, 2011, advis[ing] a bench warrant had been issued for his arrest and asking again for [Bacallao] to contact her.

Of importance here, which the [c]ourt finds as fact, is that someone, within seconds of the second phone call hereinabove mentioned, retrieved the message. Thus, someone, in possession of [Bacallao's] phone, received the message from Ross.

In addition to the communications mentioned heretofore, the [c]ourt finds that Ross, after [Bacallao] was incarcerated on the bench warrant on or about February 16, 2011, sent, on March 2, 2011, a letter to [Bacallao] asking that he contact her and [inform] him of the new court dates.

The [c]ourt finds the only communication Ross received concerning the case was from [Bacallao's] then girlfriend, now wife, Oneida Gamez. Ross declined to discuss the case with Gamez due to the fact that Gamez was also indicted on the same charges and had a different public defender assigned her case. The [c]ourt finds that Ross asked Gamez to have [Bacallao] contact her directly but received no communication from him. The court notes that in his Affidavit of Indigency executed by [Bacallao] to secure court[-]appointed counsel is an acknowledgment that [Bacallao] understood he had a ". . . responsibility to maintain contact and communications with the attorney appointed to represent me . . . ."

The [c]ourt, therefore, finds that Ross attempted to keep [Bacallao] informed of his court dates. It follows then that in doing so she adequately represented [Bacallao] in his criminal case and has not committed malpractice. Therefore, [Ross] is not vicariously liable for any damages [Bacallao] may have suffered due to being incarcerated.

¶16.  The county court entered its final judgment on the matter on April 17, 2015. Bacallao then filed a motion to reconsider, or, alternatively, for a new trial, which the county court denied.

6

¶17. Bacallao appealed the county court's decision to the circuit court, which affirmed the county court's findings. In its order affirming the county court's findings, the circuit court stated the following:

> This Court finds that the trial court applied the appropriate legal standard when weighing the evidence in this case. Further, having reviewed the trial court's record and finding that the decision of the trial court was supported by substantial evidence and was not manifestly wrong, this Court finds that the decision of the County Court of Madison County should be affirmed.

The circuit court also held that the county court did not abuse its discretion by not allowing exhibit 31 into evidence.

¶18. Finally, the circuit court's order recognized that "the decision as to whether to award sanctions is at the discretion of the trial court, and this [c]ourt finds the failure to award sanctions in this case was not an abuse of discretion." The circuit court held that since Bacallao "failed to obtain a ruling from the trial court on his Motion for Sanctions," then "the issue of whether the trial court erred by failing to consider and award sanctions is, therefore, procedurally barred."

¶19. Bacallao now appeals. On appeal, Bacallao raises the following issues: (1) the county court applied an erroneous legal standard; (2) the county court's finding were against the overwhelming weight of the evidence; (3) the county court erred in excluding exhibit 31 from evidence; and (4) the county court erred in failing to consider and award sanctions against Madison County.

## DISCUSSION

### I. Erroneous Legal Standard

7

¶20. Bacallao asserts that the circuit court applied the wrong standard when reviewing the county court's decision that Ross provided adequate legal representation to Bacallao. Bacallao specifically asserts that the circuit court erred in finding that Ross's attempts to contact him were sufficient to prove that she provided adequate representation. Bacallao maintains that Ross's representation fell below the degree of care, skill, and diligence required of an attorney in representing a client.

¶21. The standard of review that we must follow when handling an appeal of a county court judgment is as follows: "The county court was the fact[-]finder, and the circuit court, as well as this Court, are bound by the judgment of the county court if supported by substantial evidence and not manifestly wrong." *Stevens v. Grissom*, 214 So. 3d 298, 300 (¶6) (Miss. Ct. App. 2017) (quoting *Patel v. Telerent Leasing Corp.*, 574 So. 2d 3, 6 (Miss. 1990)). Furthermore, when reviewing a county court's findings of facts and conclusions of law, we recognize that

> the judgment of a circuit or county court in a non-jury trial is entitled to the same deference on appeal as a chancery court decree. That is, it will be assumed the trial judge made all necessary findings of fact in favor of [the] appellee, whether stated or not. Moreover, if the judgment of such court can be sustained for any reason, it must be affirmed, and even though the trial judge based it upon the wrong legal reason.

*Patel*, 574 So. 2d at 6.

¶22. In the present case, Bacallao asserts that Ross's "wrongful, careless, negligent and reckless actions and inactions constitute legal malpractice; breach of the duty of care; and breach of the duty of loyalty." In support of his argument, Bacallao lists nine duties that he asserts Ross failed to comport with while representing him: (1) communicate with clients;

8

(2) inform client of all matters relevant to their case; (3) exercise reasonable diligence in representing their client; (4) sufficiently investigate the facts of the case; (5) interview and select potential witnesses; (6) assist the defendant; (7) advocate the defendant's cause; (8) consult the defendant on important decisions; and (9) keep the defendant informed of important developments. Bacallao contends that the county court failed to consider the foregoing duties when determining the legal standard of care for a criminal-defense attorney.

¶23. The Mississippi Supreme Court has distinguished between two types of legal-malpractice claims: "[(1) those] based on negligence (sometimes called a breach of the standard of care) and [(2)] those based on breach of fiduciary duty (sometimes called a breach of the standard of conduct)." *Crist v. Loyacono*, 65 So. 3d 837, 842 (¶15) (Miss. 2011). Regarding claims of legal malpractice based on negligence, the Mississippi Supreme Court has stated as follows:

> To recover in a legal malpractice case in this state, it is incumbent upon the plaintiff to prove by a preponderance of evidence the following: (1) [e]xistence of a lawyer-client relationship; (2) [n]egligence on the part of the lawyer in handling his client's affairs entrusted to him; and (3) [p]roximate cause of the injury.

*Wilbourn v. Stennett, Wilkinson & Ward*, 687 So. 2d 1205, 1215 (Miss. 1996). To prove legal malpractice based on a claim of breach of fiduciary duty, the plaintiff must establish the following: (1) the existence of an attorney-client relationship; (2) the acts constituting a violation of the attorney's fiduciary duty; (3) that the breach proximately caused the injury; and (4) the fact and extent of the injury. *Crist*, 65 So. 3d at 842-43 (¶15).

¶24. The county-court judge opined that Bacallao failed to prove by a preponderance of the

9

evidence that Ross committed malpractice. As stated, the county court found that Ross presented evidence showing that she "did communicate or attempt to communicate" with Bacallao at least four times after Ross was appointed to serve as Bacallao's defense counsel. The record before us also reflects trial testimony from Ross, Bacallao, and Gamez confirming that Ross indeed mailed discovery to Bacallao and contacted him after he failed to appear at his status conference. Ross testified that on January 28, 2011, three days prior to the status conference, she called Bacallao twice and left him a voicemail. The defense presented evidence showing that Bacallao accessed his voicemail within one minute of Ross calling and leaving a message. The county court accordingly found that Ross's actions during her short period of representation failed to substantiate Bacallao's assertion that Ross was derelict in her duties.

¶25. On appeal, the circuit court then affirmed the county court's judgment after reviewing the record and "finding that the decision of the [county] court was supported by substantial evidence and was not manifestly wrong." The circuit court also held that the county court "applied the appropriate legal standard when weighing the evidence in this case."

¶26. After our review, we find that substantial evidence exists in the record to support the circuit court's decision. We thus find this issue lacks merit.

## II. Weight of the Evidence

¶27. Bacallao also argues that the county court's findings were not supported by substantial, credible, and reasonable evidence, and, as a result, the circuit court's judgment affirming the county court was against the overwhelming weight of the evidence.

10

¶28. "When reviewing the findings of a county-court judge sitting in a bench trial without a jury, we will reverse only if his or her findings are manifestly in error or clearly wrong." *Matthews v. City of Madison (Matthews II)*, 143 So. 3d 571, 573 (¶4) (Miss. 2014). The trial judge also serves as the jury for purposes of resolving all issues of fact, and the trial judge's findings are safe on appeal when supported by substantial, credible, and reasonable evidence. *Longest v. State*, 223 So. 3d 799, 802 (¶9) (Miss. Ct. App. 2017) (internal citations and quotation marks omitted)

¶29. Regarding challenges to a verdict based on the weight of the evidence, this Court has held that "[w]hen a party raises an objection to the verdict based on the weight of the evidence, this Court views the evidence in the light most favorable to the verdict." *Matthews v. City of Madison (Matthews I)*, 143 So. 3d 579, 583 (¶13) (Miss. Ct. App. 2013) (citation omitted). "The verdict will only be disturbed 'when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice.'" *Id*. Furthermore, "[t]he power to grant a new trial should be invoked only in exceptional cases in which the evidence preponderates heavily against the verdict." *Id.* at 583-84 (¶13) (citing *Amiker v. Drugs for Less Inc.*, 796 So. 2d 942, 947 (¶18) (Miss. 2000)).

¶30. Bacallao argues that Ross's attempts to communicate with him regarding his case failed to constitute adequate representation. Bacallao maintains that he offered "overwhelming evidence" to prove that Ross failed to adequately represent Bacallao, including evidence that Ross was unaware that Bacallao did not speak English until the civil action was filed. In his appellate brief, Bacallao lists nearly twenty points to justify his

11

contention that Ross failed to provide adequate representation, including the following actions: Ross's failure to inform Bacallao or his family of his court dates; Ross's failure to contact Gamez's attorney to discuss the case; Ross's failure to make additional contact with Bacallao prior to the status conference; Ross's failure to independently investigate the facts surrounding the criminal charges; Ross's failure to contact and interview potential witnesses or potential expert witnesses; Ross's failure to speak to the district attorney's office to discuss possible plea agreements; Ross's failure to explain to the judge of Bacallao's criminal case that she was unable to contact Bacallao prior to the status conference; Ross's failure to request a continuance due to her assertion that she was still receiving discovery at the time of the status conference; and Ross's failure to determine why Bacallao was absent from the status conference.

¶31.    However, the record shows that Bacallao's brief fails to address the fact that he personally never made an attempt to contact Ross directly. The trial transcript also reflects that during his seventy-eight days in jail, Bacallao made more than 100 phone calls, and none of these calls were to Ross. Moreover, Bacallao fails to cite any caselaw to support the proposition that the county court's findings were not supported by an overwhelming weight of the evidence. "Failure to cite legal authority in support of an issue is a procedural bar on appeal." *Mabus v. Mueller Indus. Inc.*, 205 So. 3d 677, 686 (¶48) (Miss. Ct. App. 2016) (citing *Webb v. DeSoto Cty.*, 843 So. 2d 682, 685 (¶10) (Miss. 2003)).

¶32.    Despite the procedural bar, we find ample evidence in the record to support the county court's determination that Ross provided Bacallao adequate legal representation. The record

reflects that at trial, Ross testified that "on or about" November 4, 2010, she received a fax from the assistant district attorney informing Ross that she had been assigned to represent Bacallao as his public defender. Ross testified that the fax from the assistant district attorney also contained an agreed order setting forth the dates for Bacallao's status conference, pretrial conference, and trial. Ross testified that she "had no reason to believe that [Bacallao] had not received the public defender's information sheet" containing the dates for his status conference, pretrial conference, and trial. Ross also asserted that she "had no reason to believe . . . that the [c]ourt had not informed [Bacallao] of the dates[,]" adding that "typically the criminal defendants do not learn of their [court] dates from counsel initially. . . . [T]he [c]ourt informs the person of the dates."

¶33.    Ross further testified that on the same date she received the order assigning Bacallao's case to her, she drafted and filed a motion for discovery in the matter. Ross stated that she received a response to her motion for discovery in late November. Ross testified that on November 23, 2010, she copied all of the information that she had in Bacallao's file, including the order setting forth his court dates, as well as other discovery, and sent copies to Bacallao. Ross stated that she never received a response from Bacallao after sending him the packet containing the order and discovery. However, Ross testified that she did receive a call from Gamez, who wanted to talk to Ross about the facts of the case. Ross explained at trial: "I would not talk to her because I did not want to be accused of talking to a client who was represented by counsel, and then I did not want to . . . put myself in a position where someone could say I divulged protected material to the codefendant." Ross stated that

13

she asked Gamez to have Bacallao call her directly, but Bacallao never called.

¶34. Ross also testified that on January 28, 2011, three days before the date for Bacallao's status conference, she called Bacallao at the number listed for him in his file. Ross testified that she called him twice, and left a voicemail after the second call. Ross stated that in her voicemail, she informed Bacallao that she had not heard from him since she sent out the packet containing his court dates and discovery. Ross told Bacallao that his court date was set for January 31, 2011, and that if he did not show up, a bench warrant would be issued for his arrest. Defense counsel then submitted evidence indicating that within a minute of Ross leaving Bacallao a voicemail, Bacallao accessed his voicemail and checked the message.

¶35. On cross-examination, Ross admitted that during her deposition, she provided testimony stating that when she called Bacallao on January 28, 2011, "there [was] no place for [her] to leave a voicemail on the machine." However, Ross clarified at trial: "[M]y testimony today is that, having seen the records, the records reflect that I did, in fact, leave a voicemail. . . . And I had no other reason to call [Bacallao] except to communicate his court date when I called on January 28th."

¶36. Ross further testified that Bacallao failed to attend the status conference. As a result, the judge issued a bench warrant for his arrest. Ross testified that when she arrived back to her office after the status conference, she wrote Bacallao a letter informing him that the judge issued a bench warrant due to Bacallao's failure to appear in court. Ross testified that someone called her office on February 16, 2010, and informed her that Bacallao had been arrested in response to the bench warrant. When questioned at trial by defense counsel as to

her understanding of what she could do to get Bacallao out of jail at this point, Ross answered as follows:

> A.    Well, in Madison County the judges are very strict.  They just don't normally reinstate a person's bond.  And at that point I had nothing to indicate to me that Mr. Bacallao had not been informed of the court dates and that he did not know when he was supposed to appear in court.
>
> I might add that Mr. Bacallao had a cash bond.  And if you look at the order that Judge Samac Richardson said—entered, the order called for Mr. Bacallao to call the court the first day, I think, of every month or at least the first of the month and to report where he was or his location or to just check in with the court.  I saw nothing in the file to indicate that he did that.
>
> Q.    So—
>
> A.    And so I was not—I had no information to use to appear and ask the judge to reinstate the bond. Now, when I sent him the letter, he had the—you know, I was hoping that he would call me and—so that we could try to get it straightened out at that time.
>
> Q.    But had you gone to the [c]ourt to ask to reinstate Mr. Bacallao's bond, what, if anything, could you have told to the [c]ourt to succeed?
>
> A.    Well, I would have had to tell the Court the facts as I knew them:  That I had sent him a copy of the order along with the discovery; that I had called him and left him a voicemail on that Friday before coming to court on the 28th; I had called him on the 28th, and he had never responded.
>
> And . . . in Madison County, I've seen judges arrest people for merely failing to call their attorney. So, as I say, these jud—they don't play when it comes down to you showing up for your date, so I felt it would be futile at that point, based on the information that I had, to request any reinstatement, and plus I had not heard from Mr. Bacallao.

Ross also testified that on March 2, 2011, she sent a letter to Bacallao while he was in jail wherein she informed him of his new court dates.  Ross stated that Bacallao never responded

15

to the March 2, 2011 letter.

¶37. Ross testified that Bacallao's file contained nothing to indicate to her that Bacallao did not speak English. Ross also testified that during her phone call with Gamez, Gamez never informed her that Bacallao could not speak sufficient English to call Ross on his own behalf. The trial transcript reflects that during the trial, the county court provided an interpreter for Bacallao. However, the record also reflects that in November 2007, Bacallao provided deposition testimony in relation to a lawsuit Bacallao filed against Nationwide Insurance as a result of the house fire. The November 2007 deposition transcript contains nothing to indicate that Bacallao testified with the help of an interpreter; instead, the transcript reflects that Bacallao testified in English. At trial, the defense counsel questioned Bacallao about his November 2007 deposition testimony, asking Bacallao if he was provided with an interpreter. Defense counsel also asked if Bacallao saw anything in the deposition transcript to reflect that an interpreter translated Bacallao's deposition testimony. Bacallao testified that he did not remember if an interpreter attended the deposition, but he claimed that "either [Gamez] helped me or there was an interpreter." At trial, Ross also testified that she "reviewed the transcript of Mr. Bacallao where he spoke English well enough to do a deposition in the Nationwide lawsuit."

¶38. The county-court judge also heard testimony from Ford, the defense's expert witness, who provided expert testimony regarding client communications and representation in the legal field. During his trial testimony, Ford opined that after reviewing the case, Ross made efforts to contact Bacallao and complied "in every way" to inform Bacallao of his court

16

dates. Ford testified that he did not think Ross breached the legal standard of care with respect to her representation of Bacallao before or after the January 31, 2011 status conference. Ford also testified that Bacallao had an obligation as a client to stay in touch with his attorney.

¶39. Upon our appellate review of this issue, we recognize that "[t]he trial judge has sole authority to determine the credibility of a witness when sitting as the trier of fact in a bench trial." *Matthews II*, 143 So. 3d at 573 (¶4). Here, the county-court judge heard testimony from Bacallao, Gamez, Silva, Ross, as well as Ford. The county-court judge's order reflects that he weighed all of the testimony and evidence and found that Bacallao failed to show by a preponderance of the evidence that Ross committed malpractice. Upon our review, and after viewing the evidence in the light most favorable to the verdict, we cannot say that allowing the verdict to stand would be an unconscionable injustice. This issue lacks merit.

### III. Exclusion of Evidence

¶40. Bacallao next argues that the county court erred by excluding a set of Ross's client letters from being entered into evidence. Bacallao contends that the letters would have shown Ross's usual and customary practice regarding initial correspondence with criminal-defense clients.

¶41. Bacallao fails to cite any caselaw in his appellate brief to support this argument. Therefore, it is procedurally barred. *See Mabus*, 205 So. 3d at 686 (¶48). Procedural bar notwithstanding, we recognize that "[w]hen reviewing the admissibility of evidence, this Court will only reverse when an abuse of discretion resulting in prejudice to the accused

occurs." *Matthews I*, 143 So. 3d at 585 (¶23) (internal citations omitted); *see also Blake v. Clein*, 903 So. 2d 710, 722 (¶30) (Miss. 2005).

¶42.   As stated, at trial, Bacallao's counsel moved to have a set of Ross's letters introduced into evidence as exhibit 31 in order to show Ross's usual and customary practice regarding initial correspondence with criminal-defense clients.  Defense counsel objected to the trial court admitting these letters, arguing that the letters relate to clients previously represented by Ross, and that these prior clients are unrelated to the current case against Bacallao. Defense counsel also objected on the basis that the letters were produced approximately a week before trial, and well past the discovery period.  Bacallao's counsel disputed the timeliness of when he produced the letters to the defense counsel.

¶43.   The county-court judge ultimately ruled that the letters would not be allowed into evidence.  The county-court judge explained to Bacallao's counsel that it "has been well established" during trial that Ross normally provides her clients with a letter containing their court dates, but failed to provide Bacallao a letter containing his court dates.

¶44.   Bacallao does not allege in his brief that his case was prejudiced by the exclusion of exhibit 31.  Upon our review, we also find no prejudice suffered by Bacallao as a result of the county-court judge's exclusion of the letters.  This issue lacks merit.

**IV.    Sanctions**

¶45.   Finally, Bacallao argues that he is entitled to sanctions under Mississippi Rule of Civil Procedure 11[3] as a result of "Madison County's efforts to delay and thwart this litigation."

_____

[3] Mississippi Rule of Civil Procedure 11(b) provides, in pertinent part, as follows:

18

Bacallao argues that Madison County refused to admit Ross's employment status for two years. Bacallao asserts that Madison County only admitted that Ross was an employee of Madison County shortly before trial. Bacallao claims that Madison County's failure to admit Ross's employment status resulted in additional expenses and hardship because Bacallao's counsel had to prepare two distinct cases: one for Ross, and one for Madison County.

¶46. Madison County argues that when it filed its answer, it believed that Ross was an independent contractor. Madison County claims that it subsequently learned that public defenders are considered county employees.

¶47. The supreme court has held that the decision to award monetary sanctions under Rule 11 is left to the discretion of the trial court. *In re Spencer*, 985 So. 2d 330, 336-37 (¶19) (Miss. 2008). On appeal, we "review[] the judgment of the sanctioning trial court for abuse of discretion." *Id*. (citing *Wyssbrod v. Wittjen*, 798 So. 2d 352, 357 (¶17) (Miss. 2001)).

¶48. The record reflects that on May 21, 2011, Bacallao filed a motion for sanctions against both Ross and Madison County, asserting that their bad-faith delay caused Bacallao unnecessary expense and hardship. After the trial, the county court entered its order finding that Ross adequately represented Bacallao. The county court accordingly found that Madison County "[was] not vicariously liable for any damages Bacallao may have suffered due to being incarcerated." Bacallao filed a motion for reconsideration or, in the alternative, a new

If any party files a motion or pleading which, in the opinion of the court, is frivolous or is filed for the purpose of harassment or delay, the court may order such a party, or his attorney, or both, to pay to the opposing party or parties the reasonable expenses incurred by such other parties and by their attorneys, including reasonable attorneys' fees.

trial. In that motion, Bacallao argued that the county court should have granted a judgment for Bacallao for damages and sanctions.

¶49. On appeal, the circuit court entered an order stating that "the decision as to whether to award sanctions is at the discretion of the trial court, and this [c]ourt finds the failure to award sanctions in this case was not an abuse of discretion." The circuit court held that since Bacallao "failed to obtain a ruling from the trial court on his [m]otion for [s]anctions," then "the issue of whether the trial court erred by failing to consider and award sanctions is, therefore, procedurally barred" pursuant to Uniform Rule of Circuit and County Court 2.04.[4]

¶50. As stated, the decision to award sanctions rests in the discretion of the trial court. Here, the county court failed to address sanctions in its order. The record also reflects that Bacallao failed to seek an independent determination of sanctions. We thus find no abuse of discretion in the county court's failure to award sanctions against Madison County. We therefore affirm the judgment of the circuit court.

¶51. **AFFIRMED.**

**IRVING AND GRIFFIS, P.JJ., BARNES, FAIR, GREENLEE AND TINDELL,**

---

[4] At the time the circuit court entered its judgment, Uniform Rule of Circuit and County Court 2.04 set forth the following:

> It is the duty of the movant, when a motion or other pleading is filed, including motions for a new trial, to pursue said motion to hearing and decision by the court. Failure to pursue a pretrial motion to hearing and decision before trial is deemed an abandonment of that motion; however, said motion may be heard after the commencement of trial in the discretion of the court.

Rule 2.04 remains unchanged in the recently renamed Uniform Civil Rules of Circuit and County Court.

**JJ., CONCUR. LEE, C.J., DISSENTS WITH SEPARATE WRITTEN OPINION. WILSON AND WESTBROOKS, JJ., NOT PARTICIPATING.**

**LEE, C.J., DISSENTING:**

¶52. Bacallao was incarcerated for seventy-eight days for no reason other than his attorney failed to inform him of his court dates. The majority finds that the decisions of the county court and circuit court—that Ross's representation of Bacallao was adequate and that she did not commit legal malpractice—were supported by substantial credible evidence and should be affirmed. I disagree and find that the decisions of the county court and circuit court wholly lacked support by substantial credible evidence, and should be reversed. Thus, I respectfully dissent.

¶53. The majority notes that the county court found that Ross presented evidence that she "did communicate or attempt to communicate" with Bacallao. At trial, Ross testified that she called Bacallao twice and left a voicemail on Friday afternoon prior to his Monday status conference. Yet Ross's trial testimony is contradicted by her own previous testimony at her deposition, where she testified that she did not leave a voicemail because there was no voicemail option available. Upon being shown phone records, which indicated that her office number called Bacallao's number and that a voicemail was left, Ross testified that she must have left a voicemail containing the date of the status conference, as she would have had no other reason to call Bacallao. She did not testify that she remembered leaving the voicemail or its contents, only that the phone records indicated she had left a voicemail and what the voicemail must have contained. Not only is her trial testimony contradictory to her deposition testimony, it is speculative at best. Ross did not *remember*, and there is nothing

21

to indicate that the voicemail from Ross's office number contained the dates of Bacallao's status conference or that the voicemail was anything other than airtime. In fact, there is nothing to indicate that Ross herself, instead of her secretary, called Bacallao's number. Ross's testimony that she did not leave a voicemail, her later contradictory testimony evidencing an inability to remember, and Bacallao's testimony that he did not receive a voicemail containing the dates of his status conference demonstrate a lack of substantial credible evidence that Ross communicated with Bacallao to inform him of all matters of reasonable importance related to her representation—namely, when he was due in court.

¶54. Ross's failure to communicate with Bacallao about the status-conference date is only underscored by her further inadequate representation of him. At the status conference, Ross made no effort or attempt to mitigate Bacallao's absence by informing the judge that she had been unable to reach Bacallao, seeking a continuance or seeking to have the bench warrant withdrawn. After the bench warrant was issued for Bacallao's failure to appear, and he was consequently arrested, Ross visited the jail at least seven times during his seventy-eight days of incarceration according to sign-in logs at the sheriff's office. Yet she never once visited Bacallao on any of these seven occasions. In fact, Ross had never met or even spoken with Bacallao until she was deposed in his legal-malpractice suit against her. Only at this time did Ross learn that he did not speak English.

¶55. Ross makes much ado about Bacallao's duty as a client to communicate with her. Despite the evidence that Bacallao did not speak English, and that his family members' attempts to communicate with Ross were met only with her refusal, it is not Bacallao's

communication that is at issue here. In this legal-malpractice suit, it is Ross's duty as an attorney to communicate with her client—not Bacallao's—that is the subject of scrutiny. "In all professional functions a lawyer should be competent, prompt[,] and diligent." Miss. R. Prof. Conduct, Preamble. The duties owed to clients by their lawyers are owed irrespective of the client's criminal-defendant status. Nevertheless, it bears noting that after Ross's lack of representation, Bacallao retained other representation under which he was released from jail on bond, and discovery lead to the dismissal of his indictment.

¶56. I also would find that the trial court abused its discretion by failing to admit exhibit 31—letters showing Ross's usual and customary practice of informing her criminal clients the dates that they were required to appear in court with a warning that failure to appear in court upon those dates would result in a warrant for their arrest. Because this case hinged on the standard of care and Ross's duty to inform Bacallao of his court dates, evidence showing Ross's usual, customary practice—the practice of a defense attorney and her failure to adhere to it—should not have been excluded. Therefore, with respect to this issue, I also dissent.

¶57. For a client to recover in a legal-malpractice claim, he must show by a preponderance of the evidence that but for his attorney's breach of the standard of care, he would not have sustained the injury. *Donovan v. Burwell*, 199 So. 3d 725, 732 (¶23) (Miss. Ct. App. 2016). I cannot agree, as the majority apparently does, that failure to mail Bacallao his court dates, failure to even call him until the Friday afternoon before his Monday-morning court date, two phone calls seconds apart with an unsubstantiated voicemail, failure to ever visit him in jail,

23

and failure to do anything else otherwise to represent him constitute adequate legal representation. Here, the record clearly shows that Bacallao established by a preponderance of the evidence that, but for Ross's failure to inform him of his court dates, he would not have spent seventy-eight days in jail for failure to appear. The county court's and circuit court's findings otherwise lacked support by substantial credible evidence. For these reasons, I would reverse the judgments of the county and circuit courts and, thus, dissent.