# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2020-CA-01409-COA

ONE HUNDRED FIFTY-THREE THOUSAND
THREE HUNDRED FORTY DOLLARS
($153,340.00) IN UNITED STATES CURRENCY
AND GENE PARNELL TAYLOR

APPELLANTS

v.

STATE OF MISSISSIPPI EX REL. RANKIN
COUNTY SHERIFF'S OFFICE

APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 12/10/2020 |
| TRIAL JUDGE: | HON. JOHN H. EMFINGER |
| COURT FROM WHICH APPEALED: | RANKIN COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANTS: | AMMIE THI NGUYEN |
| ATTORNEYS FOR APPELLEE: | MICHAEL SHELTON SMITH II |
| | JOHN K. BRAMLETT JR. |
| | CHRISTOPHER TODD McALPIN |
| NATURE OF THE CASE: | CIVIL - OTHER |
| DISPOSITION: | AFFIRMED - 09/13/2022 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**GREENLEE, J., FOR THE COURT:**

¶1.     In this civil action, the Rankin County County Court held that $153,340 in United States Currency should be forfeited to the Rankin County Sheriff's Office. The county court found that the claimant Gene Taylor—though not charged with a felony—was engaged in "a drug-courier endeavor" and that the $153,340 found in his possession were proceeds of one or more violations of Mississippi's Uniform Controlled Substances Law. *See* Miss. Code Ann. § 41-29-101 to -191 (Rev. 2018). Subsequently, Taylor appealed Judge Kent

McDaniel's decision to the Rankin County Circuit Court, and Judge John Emfinger affirmed the county court's order of forfeiture.

¶2. Taylor asserts the following issues in his appeal that is now before this Court: (1) whether the evidence supported the forfeiture of the currency, (2) whether the forfeiture amounted to an excessive fine, and (3) whether testimony that Taylor met a drug-courier profile was sufficient evidence to prove that the currency was forfeitable. Finding no reversible error, we affirm the circuit court's judgment affirming the county court's order.

## FACTS AND PROCEDURAL HISTORY

¶3. In March 2018, the State of Mississippi, on behalf of the Rankin County Sheriff's Office (the State), filed a petition for forfeiture alleging that on March 15, 2018, an officer lawfully stopped a 2016 Majestic recreational vehicle (RV) traveling westbound on Interstate 20 (I-20) in Rankin County. Gene Taylor, the driver and sole occupant of the RV, advised the officer that he had tetrahydrocannabinol (THC) in his possession. After a K-9 alerted to the odor of drugs on the RV, the RV was searched pursuant to a warrant. Law enforcement found two cardboard boxes containing $147,540 and a red duffle bag containing $5,800. A K-9 later alerted to the odor of drugs on the currency. In its petition, the State requested that the seized currency be forfeited. Thereafter, Taylor filed an answer and affirmative defenses, in which he asserted that the $153,340 belonged to him.

¶4. In February 2020, a forfeiture hearing was held in the Rankin County County Court. The State called the following witnesses to testify: Deputy Ronnie Decell, Deputy Sentel

Easterling, and Investigator Brad Smith. Additionally, Captain Nick McLendon testified as an expert witness. Taylor testified on his own behalf and called Dr. Howard Campbell to testify as an expert witness.

¶5. The State presented evidence that on March 15, 2018, Deputy Decell with the interstate interdiction unit of the Rankin County Sheriff's Office conducted a traffic stop of a rented RV with a California license plate for careless driving on I-20 West in Rankin County.[1] According to Deputy Decell, Taylor—the driver and sole occupant of the RV—had crossed the white fog line several times. When Deputy Decell approached the RV, Taylor explained that he had driven from his residence in the State of Washington with the intention of driving to Florida, but when he arrived in Atlanta, Georgia, he decided to go to Texas instead. Deputy Decell noted that Taylor did not appear to be impaired and recognized that the wind could cause a RV to cross the fog line, so he decided to issue a warning.

¶6. While Deputy Decell was writing the warning, he obtained Taylor's driver's license information and criminal history. Deputy Decell discovered, based on cameras at the state line, that Taylor had driven east through northern Mississippi the day before. Deputy Decell testified that this detail "agree[d] with the story that [Taylor] gave [him]," but it was "kind of puzzling . . . why somebody would drive forty hours plus and then decide to turn around and go back[.]" He testified that this was a red flag to him. Deputy Decell also discovered

_____

[1] The RV had been rented from Cruise America in the State of Washington on March 10, 2018.

3

that Taylor had been charged with possession of marijuana in Texas in 2012.

¶7.     When he approached the RV again, Deputy Decell asked Taylor if he had ever been arrested and if there was anything illegal in the RV. Taylor later testified that he was asked if he had ever been "in trouble." Taylor stated that he had not, but when Officer Decell confronted him with the prior drug charge, he paused and then said, "[O]h, yeah, I do. You're right. I do have a charge." Taylor also told Deputy Decell that there was nothing in the RV but then picked up a vape pen and said, "[A]ll I have is this vape pen. It's THC oil." Deputy Decell asked Taylor if there was anything else in the RV—specifically narcotics, large amounts of U.S. currency, or items being transported for someone else. Taylor responded, "No." Deputy Decell indicated that he was suspicious of additional criminal activity because of Taylor's travel pattern and untruthfulness about his criminal history. Because THC was illegal in Mississippi, Deputy Decell intended to search the RV but asked Taylor for consent. Taylor refused to consent to a search and was arrested for possession of the vape pen with THC oil.[2]

¶8.     Deputy Decell testified that a certified K-9, which was trained to alert to marijuana, cocaine, heroin, methamphetamine, and ecstasy, alerted to the driver's door handle of the RV. Deputy Decell notified Taylor that he had probable cause to search the RV and asked him if there was anything else that he wanted to tell him, but Taylor invoked his right to

_____

[2] The parties stipulated to a report from the Mississippi Forensics Laboratory, which concluded that the substance in the vape pen was THC and that "the lab report [could not] quantify the amount."

4

counsel. Then, Taylor was transported to the Rankin County Jail, and the RV was transported to the "Rankin County Shop" to be searched.

¶9. After Investigator Smith obtained a warrant, Deputy Decell and Deputy Easterling searched the RV. They found a small red duffle bag containing clothes, a toiletry bag, and $5,800. They also found two cardboard boxes, which were in the cabinets in the back of the RV. One box contained a blanket on top of currency that was banded together with bank bands and rubber bands. The other box contained a blanket on top of currency that was bank banded and wrapped in plastic. The total amount of currency in the two boxes was $147,540. Deputy Decell and Deputy Easterling also found to-go boxes and receipts in the RV. Deputy Decell testified that the receipts indicated that Taylor had been to Anderson, South Carolina, even though he stated that he had turned around in Atlanta, Georgia. Deputy Easterling testified that his K-9 later alerted to the odor of drugs on the currency.

¶10. Ultimately, Taylor was released and given enough money to drive home in the RV. According to Deputy Decell and Investigator Smith, Taylor stated at the time of his release that the currency in the red duffle bag belonged to him, but he did not claim the currency in the cardboard boxes.[3] Later, Taylor testified that he meant that all the currency belonged to him.

¶11. Captain McLendon testified as an expert in "criminal interdiction, smuggling[,] and

---

[3] Taylor was given the return for the search warrant, which listed the items that had been seized.

5

drug-courier profile." According to Captain McLendon, Taylor fit the profile of a drug courier. In reaching his opinion, Captain McLendon considered several factors. He testified that Taylor's prior drug charge showed that he had knowledge of marijuana, and the fact that he lived in Washington was significant because Washington had become a source for illegal distribution of marijuana. He further testified that Atlanta—where Taylor indicated that he had turned around—was the largest drug-distribution area in the region. He also testified that Taylor's untruthfulness about his criminal history was "very consistent . . . with drug trafficking." Next, Captain McLendon explained that currency often traveled west on I-20, as it did in this case, whereas drugs traveled east on I-20. Captain McLendon testified that the fact that Taylor was driving a rented RV was significant because drug couriers tend to rent vehicles to avoid detection and to avoid their personal vehicles being seized. He testified that Taylor's travel pattern and the amount of luggage in the RV was "consistent with subjects who are trying to get from point A to point B very quickly." He testified that the fact that Taylor did not claim the currency that was later found under blankets in cardboard boxes led him to believe that Taylor was trying to conceal the source of the currency. He further explained that the currency in the duffle bag could have been Taylor's payment for transporting the drugs and that drug couriers often claim the smaller amount of currency as theirs because they view it as theirs. Finally, Captain McLendon considered the odor of drugs on the vehicle and the currency in reaching his opinion that Taylor fit the profile of a drug courier.

6

¶12. On cross-examination, Captain McLendon acknowledged that law enforcement did not find a large amount of drugs, weapons, small baggies, scales, air freshener, tools, tape, drug ledgers, or hidden compartments in the RV. Additionally, he acknowledged that there were not any reports tracing the currency to an exchange of drugs, and no evidence indicated that Taylor had ever been stopped with large amounts of currency or for transporting drugs. However, Captain McLendon testified that none of the factors taken alone would be enough to classify a person as a drug courier. Rather, drug-courier profiling was based on the totality of the circumstances.

¶13. After the State rested its case-in-chief, the court denied Taylor's motion to dismiss. Taylor then testified on his own behalf. According to Taylor, he lost a kidney due to cancer in 2008 and retired in 2011 after working for approximately forty-five years. He and his wife purchased a motor home to travel but realized that they did not enjoy traveling like that, so they purchased property in Texas and returned to Washington in the summertime. In 2016, Taylor and his wife moved back to Washington permanently but seemingly kept the property in Texas until the year before the forfeiture hearing. According to Taylor, in 2018, he and his wife were not getting along, and his mother had recently passed away. So he rented a RV, grabbed a few clothes and two boxes of money, and left Washington without knowing if he would return. Taylor testified that he did not know where he was going. He considered

7

visiting a cousin in Jacksonville, Florida, but then began reminiscing about South Carolina.[4]

He testified that when he arrived in Anderson, South Carolina, he did not know where to go, so he turned around and decided to go to Texas. According to Taylor, Deputy Decell asked him where he had traveled from on that day and explained that was why he said Atlanta, Georgia.

¶14. Taylor testified that he "hoarded money" all his life and that the currency was part of his life's savings. He testified that he and his wife saved approximately $1,000 per month over a number of years, totaling approximately $168,000. He further indicated that he had the currency in boxes because he did not trust banks. However, he later acknowledged that he had a bank account and used a debit card and direct deposit. Taylor admitted to not telling Deputy Decell about his prior drug charge but noted that he had never been convicted of a felony. Finally, he suggested that he did not mention the currency in the RV to Deputy Decell because he did not consider a hundred and fifty thousand dollars to be a large amount of money.

¶15. Dr. Howard Campbell, a professor at the University of Texas at El Paso, testified in behalf of Taylor as an expert in "drug interdiction and drug courier."[5] According to Dr.

---

[4] Taylor initially testified that his childhood in South Carolina was "a very trying experience."

[5] The county court later noted that "Dr. Campbell provided a generic lecture on Mexican cartel trafficking . . . [and] while generally interesting . . . was not particularly relevant to the instant case which was decidedly not a Mexican cartel case in this court's view."

8

Campbell, major drug cartels primarily used young Latino males as drug couriers, and he had never heard of a drug courier who was Japanese American. He also noted that it was uncommon for currency to be found outside of a hidden compartment, and he asserted that all interstate highways were drug routes. Ultimately, Dr. Campbell concluded that Taylor did not fit the profile of a drug courier because he was an elderly Japanese American with health problems, and "his patterns [were] unpredictable," meaning "he could take the drugs and cash and run."

¶16. After the defense rested, the State called Deputy Decell to testify on rebuttal. Deputy Decell testified that he did not remember seeing any currency that appeared to be older during a preliminary count of the currency. At the conclusion of the hearing, the judge took the matter under advisement.[6]

¶17. In March 2020, the county court entered a bench opinion and order for judgment as well as an order of forfeiture holding that the $153,340 in United States Currency should be forfeited to the Rankin County Sheriff's Office. The county court found that "a drug courier endeavor [was] precisely what Taylor was doing" and that "Taylor's explanations for his actions [were] far-fetched and not credible." The court further "found absolutely no credible claim from Taylor to any of the money." Taylor appealed to the Rankin County Circuit Court, which affirmed the county court's order of forfeiture.

---

[6] After the forfeiture hearing, the State requested and the court entered a default judgment against any unknown owner of the $153,340.

**DISCUSSION**

¶18.    On appeal, Taylor asserts the following issues: (1) whether the evidence supported the forfeiture of the currency, (2) whether the forfeiture amounted to an excessive fine, and (3) whether testimony that he met a drug-courier profile was sufficient evidence to prove that the currency was forfeitable.

**I.    Whether the evidence supported the forfeiture of the currency.**

¶19.    The county court found "by a clear preponderance of the . . . evidence that the [currency] was the proceeds of one or more violations of the Mississippi Controlled Substances Act." Taylor claims that the State failed to prove that it was entitled to the forfeiture of the $153,340. In reviewing this assignment of error, we acknowledge the following:

> Forfeiture statutes are penal in nature and must be strictly construed. In a civil forfeiture case, the question is whether, given all of the evidence taken together, a rational trier of fact could have found that the funds were the product of or the instrumentalities of violations of the State's Uniform Controlled Substances Laws. The trier of fact may act on circumstantial evidence and inferences as well as direct evidence.

*Bobo v. State ex rel. Pelahatchie Police Dep't*, 204 So. 3d 317, 323 (¶22) (Miss. Ct. App. 2016) (quoting *Evans v. City of Aberdeen*, 925 So. 2d 850, 853 (¶11) (Miss. Ct. App. 2005)). Further, "the appropriate standard of review in forfeiture cases is the familiar substantial evidence/clearly erroneous test. The appellate court will not disturb a circuit court's findings unless it has applied an erroneous legal standard to decide the question of fact." *Id*. (quoting *Six Thousand Dollars ($6,000) v. State ex rel. Miss. Bureau of Narcotics*, 179 So. 3d 1, 4 (¶4)

10

(Miss. 2015)).

¶20.    In relevant part, Mississippi Code Annotated section 41-29-153 (Rev. 2018) provides that the following is subject to forfeiture: "all money . . . which [is] used, or intended for use, in violation of this article or in violation of Article 5 of this chapter[.]"  Miss. Code Ann. § 41-29-153(a)(5).[7]

¶21.    To support its argument that the currency was used or intended for use in violation of the Uniform Controlled Substances Law, the State called several witnesses to testify at the forfeiture hearing.  Deputy Decell testified as to Taylor's course of travel, his prior drug charge, his untruthfulness regarding the prior charge, and the vape pen containing THC. Investigator Smith testified that $5,800 was found in a small red duffle bag and that $147,540 was found in two cardboard boxes, which were found in cabinets in the back of the RV. According to Deputy Decell, Taylor did not mention the currency when asked if there were large amounts of currency in the RV, and he only claimed the $5,800 in the duffle bag at the time of his release.  And ultimately, a K-9 alerted to the odor of drugs on the RV and the currency.

¶22.    Additionally, Captain McLendon testified as an expert in the field of criminal interdiction, smuggling, and drug-courier profiling and explained why he believed Taylor fit the profile of a drug courier.  In reaching his opinion, Captain McLendon considered several

---

[7] The petition for forfeiture cited Mississippi Code Annotated sections 41-29-153(a)(5) and 41-29-153(a)(7) as the basis for forfeiture.  However, the State later stipulated that proximity was not an issue; therefore, only section 41-29-153(a)(5) is relevant.

factors, including Taylor's knowledge of marijuana based on his prior drug charge, Taylor's residency in a state where marijuana had been legalized, and Taylor's untruthfulness regarding his prior charge for possession of marijuana. Captain McLendon also took into consideration that Taylor had traveled in a rented RV from Washington State to Atlanta quickly and with very little luggage. Additionally, after Taylor allegedly turned around in Atlanta and was traveling west on I-20, he was found with a large amount of currency concealed under blankets in cardboard boxes, which were found in cabinets in the back of the RV. Finally, in reaching his conclusion that Taylor fit the profile of a drug courier, Captain McLendon noted the odor of drugs on the vehicle and the currency and that Taylor did not claim the $147,540 in the cardboard boxes at the time of his release.

¶23. After reviewing all the evidence presented at the forfeiture hearing, we find no clear error; a rational trier of fact could have found that the currency was the product of or the instrumentality of violations of the State's Uniform Controlled Substances Law. The county court found that "a drug courier endeavor [was] precisely what Taylor was doing" and that "Taylor's explanations for his actions [were] far-fetched and not credible." We agree. Taylor presented no evidence that the money belonged to him except for his own testimony, which lacked credibility.

**II. Whether the forfeiture amounted to an excessive fine.**

¶24. In *One (1) Charter Arms, Bulldog 44 Special, Serial No. 794774 v. State ex rel. Moore*, 721 So. 2d 620, 624-25 (¶19) (Miss. 1998), our supreme court adopted a test that

12

applies in the context of forfeiture proceedings. We look to the following four elements:

> (1) [t]he nexus between the offense and the property and the extent of the property's role in the offense;
>
> (2) [t]he role and culpability of the owner;
>
> (3) [t]he possibility of separating the offending property from the remainder; and
>
> (4) [w]hether, after a review of all relevant facts, the forfeiture divests the owner of property which has a value that is grossly disproportionate to the crime or grossly disproportionate to the culpability of the owner.

*Id*. at 625 (¶19). The analysis has two parts. "First, under the instrumentality (or nexus) test, the forfeited property must have a sufficiently close relationship to the illegal activity. Second, under the proportionality test, forfeiture of the property must not impose upon the owner a penalty grossly disproportionate to his offense." *Bobo*, 204 So. 3d at 324 (¶27) (quoting *One (1) 2011 Chevrolet Silverado 1500 v. Panola Cnty. Narcotics Task Force*, 169 So. 3d 967, 970 (¶6) (Miss. Ct. App. 2014)). Taylor seemingly claims that the forfeiture amounted to an excessive fine.[8]

### A. The Instrumentality Test

---

[8] In the appellant's brief, Taylor claims that the county court erred by finding that the State proved by a preponderance of the evidence that the currency was proceeds from one or more violations of the Uniform Controlled Substances Law. We addressed this claim in Part I. Within this issue, Taylor argues that the court further erred by not applying the instrumentality test, by holding that the proportionality test was inapplicable, and by denying his motion to dismiss. However, the instrumentality/proportionality tests have been applied in the context of determining whether a forfeiture amounts to an excessive fine. *See Charter Arms*, 721 So. 2d at 623-26 (¶¶14-30); *Bobo*, 204 So. 3d at 324-26 (¶¶26-36).

¶25. "[U]nder the first prong of our analysis, we determine whether [Taylor's] seized property possesses a sufficiently close relationship to drug trafficking to justify forfeiture." *See id*. at (¶28).

¶26. The State presented evidence to show that the currency constituted proceeds from the sale of drugs or an instrumentality used in the furtherance of drug trafficking. The record reflects that Deputy Decell discovered a significant amount of currency under blankets inside cardboard boxes, which were found in cabinets in the back of the RV. The total amount of currency in the boxes was $147,540. Additionally, Deputy Decell found $5,800 in a small red duffle bag. The State presented evidence that at the time of the traffic stop, Taylor was deceptive about the money in the RV. When asked if there were large amounts of currency in the RV, he responded, "No." Further, at the time of his release, Taylor claimed the $5,800 in the red duffle bag but not the $147,540 in the cardboard boxes. Although Taylor claimed at trial that the money was part of his life's savings, the State presented evidence to refute his claim. Deputy Decell testified that the bundles of currency were in two separate boxes, and one of the boxes contained bundles of money that were wrapped in plastic.

¶27. Additionally, Taylor traveled quickly from Washington—a state where marijuana was legal and a source for illegal distribution to states where marijuana was illegal—and traveled to Atlanta, Georgia—the largest drug-distribution area in the region. Based on the rented RV, the amount of luggage in the RV, Taylor's prior drug charge, his untruthfulness about his prior drug charge, the odor of a controlled substance on the RV and the currency, and

14

Taylor's initial failure to claim the bulk of the currency, Captain McLendon testified that it was his opinion that the currency was used or intended to be used in violation of the Uniform Controlled Substances Law.

¶28. After review, we find no clear error; the record contains sufficient evidence to show that the currency facilitated a violation of the Uniform Controlled Substances Law. Therefore, we find the instrumentality test favors the forfeiture of the currency. Accordingly, we proceed to a discussion of whether the evidence satisfies the second prong of our analysis.

### B. The Proportionality Test

¶29. "Under this prong of our analysis, we determine whether the forfeiture of [the currency] imposes a penalty that is grossly disproportionate to the crime or to [Taylor's] culpability." *Id*. at 326 (¶35).

¶30. After review, we find the forfeiture in this case failed to result in a fine that was grossly disproportionate to Taylor's culpability. Considering the large amount of currency discovered in the RV as well as the testimony of the State's witnesses linking the circumstances of this case to the furtherance of drug trafficking, we agree with the county court that the evidence supported the forfeiture of Taylor's property. *Id.*

¶31. The dissent would apply a strict proportionality test regardless of the facts of the case, focusing on whether criminal charges have been levied on the claimant. The dissent emphasizes that "trial courts **must** consider whether the value of the property seized is proportional to the crime committed." As a result, in civil forfeiture cases where claimants,

15

though not charged with a felony, in civil proceedings are found to be in possession of drug proceeds, the dissent's application of the proportionality test would always favor the claimant. But proportionality measures the claimant's conduct in relation to the value of the property being considered for forfeiture. The county court in this case found that Taylor was engaged in "a drug-courier endeavor" and that the currency was the proceeds of one or more violations of the Uniform Controlled Substances Law. The proportionality test under these circumstances is clearly met. The county court considered Taylor's conduct as a drug courier in proportion to the value of the currency, which was proceeds from the sale of drugs, and ruled that the currency should be forfeited. The county court further found that Taylor asserted "no credible claim" to the currency, making the third prong of the proportionality test inapplicable as Taylor had not shown that he was the owner of the currency. We find no clear error.

### III. Whether testimony that Taylor met a drug-courier profile was sufficient evidence to prove that the currency was forfeitable.

¶32. Finally, Taylor presents the following issue: whether evidence of a drug courier profile was sufficient to prove that the currency was forfeitable "when no illegal drugs or paraphernalia [were] found and [there was] no direct or corroborat[ing] evidence . . . of any illegal drug activities[.]" Taylor asks this Court to hold that drug-courier profiling is insufficient to divest an owner of his property without direct proof or corroborated evidence that the property was used or intended to be used in violation of the Uniform Controlled Substances Law.

16

¶33. As discussed above, we find that there was sufficient evidence to support the forfeiture of the currency. Additionally, we have already discussed in detail the evidence that led Captain McLendon to his conclusion that Taylor met the profile of a drug courier. Captain McLendon emphasized that no single factor would result in a determination that Taylor met the profile of a drug courier. Rather, it was only after he considered a number of factors that he determined that Taylor met the profile of a drug courier.

¶34. Taylor essentially takes issue with the fact that there were no drugs in the RV (besides the THC oil) and that the evidence in this case was circumstantial. But as stated, "[t]he trier of fact may act on circumstantial evidence and inferences as well as direct evidence." *Bobo*, 204 So. 3d at 323 (¶22) (quoting *Evans*, 925 So. 2d at 853 (¶11)). Further, "[F]orfeiture can be based on wholly circumstantial evidence and inference." *Jones v. State ex rel. Miss. Dep't. of Pub. Safety*, 607 So. 2d 23, 29 (Miss. 1991). We find no reversible error.

¶35. **AFFIRMED.**

**BARNES, C.J., CARLTON, P.J., LAWRENCE AND SMITH, JJ., CONCUR. McCARTY, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. WILSON, P.J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION. McDONALD, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION. WESTBROOKS, J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY McDONALD, J.; McCARTY, J., JOINS IN PART. EMFINGER, J., NOT PARTICIPATING.**

**WESTBROOKS, J., DISSENTING:**

¶36. Based on the record, the Rankin County County Court failed to appropriately apply the proportionality test. I would further find that the Rankin County Circuit Court, in its

stead as an appellate court, went beyond the scope of its standard of review to reach its conclusion to affirm the county court's order of forfeiture. Therefore, I respectfully dissent from the majority's decision to affirm the circuit court's judgment.

¶37.    In this case, the Rankin County Sheriff's Office subjected Gene Taylor to a traffic stop on March 15, 2018, from which the sheriff's office found and seized Taylor's $153,340. No drugs were found in Taylor's vehicle.[9] On March 19, 2018, the State filed a petition for forfeiture of the $153,340. On August 21, 2019, Taylor was convicted of a misdemeanor for possession of a vape pen, and the forfeiture hearing was held on February 12, 2020.

¶38.    On appeal, Taylor argues that the seizure of his $153,340 violated the Excessive Fines Clause, Miss. Const. art. 3, § 28. To determine whether Taylor's fine was excessive, we must look to our Mississippi Supreme Court's decision in *One (1) Charter Arms, Bulldog 44 Special, Serial No. 794774 v. State ex rel. Moore*, 721 So. 2d 620, 625 (¶19) (Miss. 1998).

¶39.    In *Charter Arms*, police officers, through an informant, were told that an individual in a black Corvette was in the "Red Line District" purchasing cocaine. *Id*. at 622 (¶2). In the train station of that district, the officers later saw Kevin Williams sitting in his black Corvette. *Id*. at 622 (¶3). The officers immediately pulled up beside Williams. *Id*. Williams then placed an unknown substance in his mouth. *Id*. at (¶4). The officers attempted to stop Williams from swallowing the substance but were unsuccessful. *Id*. The officers placed

_____

[9] I distinguish the THC vape pen found on Taylor's person. The officers did not find any drugs during their vehicle search and the parties stipulated that no drugs were found in proximity to the $153,340.

18

Williams under arrest and "found a crack pipe in [Williams'] hand." *Id*. The officers also swabbed Williams with a latex glove and then searched the vehicle. *Id*. at (¶¶5-6).

¶40. Among other things, they found a "Charter Arms .44 Special handgun . . . ." *Id*. at (¶6). Both the latex glove and the crack pipe tested positive for cocaine. *Id*. Ultimately, Williams was charged with and pled guilty to possession of cocaine, resulting in probation and fines and court costs totaling $2,764.50. *Id*. at (¶6). At the end of Williams' three-year probation period, the State filed a forfeiture petition seeking to seize Williams' handgun and black Corvette. *Id*. at (¶7). The trial court granted the forfeiture, and Williams appealed arguing that the seizure of his vehicle violated the Excessive Fines Clause. *Id*. at (¶8).

¶41. Likewise, Taylor appeals asserting that the seizure of his $153,340 violated the Excessive Fines Clause. We have held that "[f]orfeiture statutes are penal in nature and must be strictly construed." *Evans v. City of Aberdeen*, 925 So. 2d 850, 853 (¶11) (Miss. Ct. App. 2005); *see Charter Arms*, 721 So. 2d at 623 (¶12) (citing *Austin v. United States*, 509 U.S. 602, 619-20 (1993)). In *Charter Arms*, our Mississippi Supreme Court, after adopting and applying a hybrid four-prong test, held that the seizure of Williams' Corvette was grossly disproportionate to Williams' crimes. *Charter Arms*, 721 So. 2d at 626 (¶27). The four prongs of the test are the following:

> (1) The nexus between the offense and the property and the extent of the property's role in the offense;
>
> (2) The role and culpability of the owner;
>
> (3) The possibility of separating the offending property from the remainder;

and

> (4) Whether, after a review of all relevant facts, the forfeiture divests the owner of property which has a value that is grossly disproportionate to the crime or grossly disproportionate to the *culpability of the owner*.

*Id*. at 625 (¶19) (emphasis added). In express terms, our Supreme Court further stated:

> The above test combines the elements of the instrumentality test with a weighing of proportionality on the individual circumstances of each case to determine whether the forfeiture is excessive. It avoids the harsh and unjust results that can be, and will be, produced by the implementation of a "bright-line" instrumentality test.

*Id*. at (¶20). Accordingly, to apply the *Charter Arms* test correctly, trial courts **must** consider whether the value of the property seized is proportional to the crime committed. The same was true in *Bobo*, on which the majority relies to affirm. *Bobo v. State ex rel. Pelahatchie Police Dep't*, 204 So. 3d 317, 324-26 (¶¶27, 35-36) (Miss. Ct. App. 2016). In *Bobo*, although no drugs were found in the vehicle, the trial court held that the monies found were drug proceeds. *Id*. at (¶25). And while we did find that forfeiture was proper in that case, we *also* properly applied and analyzed all four prongs of *Charter Arms*. *Bobo*, 204 So. 3d at 324-26 (¶¶27-36). But in the case at bar, the county court failed to apply an appropriate proportionality review. This was clear error. *Charter Arms*, 721 So. 2d at 626 (¶¶29, 31) (explaining why the failure to apply the combined test violates our Mississippi Constitution).

## I.    The county court applied an incorrect legal standard.

¶42.    The appropriate legal standard is a hybrid test, requiring both an instrumentality test and proportionality review. *Id*. Here, the county court never considered the proportionality

of Taylor's culpability to the $153,340 forfeiture, even though no drugs were found in Taylor's recreational vehicle. Similar to *Charter Arms*, police officers arrested Taylor for possessing a vape pen, and the State filed a petition to seize Taylor's $153,340.

¶43. The record reflects that the county court was aware of *Charter Arms* yet failed to apply the entirety of the four-prong test:

> COURT: Hold on. Quit wasting my time. We had an agreement. Proportionality is not an issue. Don't argue to me a proportionality case. I don't care what the factors were. If proportionality is a legal issue, then they are irrelevant to me . . . .
>
> COURT: This is not a - - proportionality has been an issue ever since the Charter Arms case. I wasn't even on the bench then. I think I was still working in law enforcement. But, Mr. Khalaf, I don't appreciate your coming in here and arguing facts that relate to one issue when your co-counsel announced at the beginning that very issue was not going to be a factor in this case. I've let you make your record.
>
> COXWELL: . . . Proximity was not an issue in this case. Proportionality I think he's just bringing up out of the Supreme Court case. The issue they said they weren't fighting over was the proximity issue; that is, the drugs weren't in proximity to - -
>
> COURT: I understand and thank you for correcting that. But the point is, that's where all this comes in. Nexus, the nexus between the drugs and the money, et cetera. So those are the kinds of things that I'm concerned about that *proportionality just doesn't enter into a case because there were no drugs*.[10]

(Emphasis added).

---

[10] It is worth noting that at the time of the hearing, the county court had not yet concluded that the seized $153,340 were the product of multiple drug transactions.

21

¶44. The county court presumed that because no drugs were found in proximity to the money, it did not need to analyze whether the $153,340 were proportional to Taylor's conduct. This was clear error. As was the case here, the forfeiture in *Charter Arms* was based upon circumstantial evidence—no physical drugs were found and the value of a Corvette is comparable to if not less than the $153,340 seized in this case. *See Charter Arms*, 721 So. 2d at 622 (¶5). Yet our Supreme Court maintained that proportionality must be considered. Therefore, when the county court concluded as a matter of law that "proportionality of the value of the seizure to the amount of drugs [being] transported, and like arguments [were] inapposite on these facts," it committed manifest error. *See Lowrey v. Lowrey*, 25 So. 3d 274, 280 (¶7) (Miss. 2009) (holding trial court's failure to consider *Armstrong* factors was manifest error); *Scoggins v. Ellzey Beverages Inc*. 743 So. 2d 990, 996 (¶7) (Miss. 1999) (considering whether trial court applied correct standard).

¶45. If there were ever a time that *Charter Arms* applies, it is in a case such as this where there were no drugs found in the vehicle, and by circumstantial evidence alone, the trial court found that the monies seized were drug proceeds. *See Hickman v. State ex rel. Miss. Dep't of Pub. Safety*, 592 So. 2d 44, 46 (Miss. 1991). As such, the county court was also duty bound to analyze how the seizure of the drug proceeds did not exceed Taylor's culpability. While I agree with the county court's factual finding that Taylor's culpability is that of a

22

"drug courier," the fact remains that the county court failed to consider proportionality.[11]

## II.      The circuit court exceeded the scope of review.

¶46.    The Rankin County Circuit Court, sitting as an appellate court, had a limited standard of review.  The circuit court should have determined only whether the county court had substantial evidence to conclude that the forfeiture was proportional to Taylor's offense. *Biloxi Dock & Ice LLC v. Back Bay Fuel and Ice LLC*, 340 So. 3d 378, 382 (¶16) (Miss. Ct. App. 2022) ("In cases where 'the county court sits as the fact-finder, the circuit court and this Court, as appellate courts, are bound by the judgment of the county court if supported by substantial evidence and not manifestly wrong.'" (quoting *Turnage v. Brooks*, 301 So. 3d 760, 763 (¶9) (Miss. Ct. App. 2020))).  Instead, the circuit court made a legal conclusion that the county court did not—that because the money was drug proceeds, the forfeiture could not be excessive.[12]  This application went beyond the circuit court's scope of review.

¶47.    The question before the circuit court was whether the county court had substantial evidence to find that the forfeiture was not excessive.  As discussed above, the county court never made such a finding.  Yet the circuit court subsequently concluded that "to require the full amount of the funds received from drug transactions to be forfeited is not an excessive

---

[11] The *Charter Arms* opinion does not state whether the proportionality review is strict or lenient, but rather that "the test that we have elected to employ in this action combines the elements of the instrumentality test with a proportionality review." *Charter Arms*, 721 So. 2d at 626 (¶31).  Likewise, I do not say so here.

[12] The majority adopts the same legal conclusion made by the circuit court and finds that "[t]he proportionality test under these circumstances is clearly met." *Ante* at ¶31.

fine." By doing so, the circuit court substituted its own judgment for that of the county court's ruling. *See Pub. Empls.' Ret. Sys. v. Shurden*, 822 So. 2d 258, 263 (¶13) (Miss. 2002) ("This Court may neither substitute its own judgment for that of the agency which rendered the decision nor reweigh the facts of the case."). Whether the forfeiture was excessive or not, I find that the circuit court went beyond the scope of review. Given that the circuit court exceeded its appellate authority, I would reverse the circuit court's judgment and remand for the county court to apply the correct and full legal standard.

**McDONALD, J., JOINS THIS OPINION. McCARTY, J., JOINS THIS OPINION IN PART.**