607 So.2d 23 (1991)
Daniel Paul JONES
v.
STATE of Mississippi, ex rel., MISSISSIPPI DEPARTMENT OF PUBLIC SAFETY.
No. 90-CA-0730.
Supreme Court of Mississippi.
December 18, 1991.
Rehearing Denied November 19, 1992.
*24 Ben F. Galloway, Owen Galloway & Clark, Gulfport, for appellant.
Mike C. Moore, Atty. Gen., Eric L. Johnson, William H. Magnusen, Jr., Mark C. Carroll, Jackson, for appellee.
Before ROY NOBLE LEE, C.J., and PRATHER and PITTMAN, JJ.
PITTMAN, Justice, for the Court:
Following the arrest of Daniel Paul Jones for possession of marijuana and a search of his automobile, the State of Mississippi filed this civil action, a Petition for Forfeiture pursuant to Miss. Code Ann. § 41-29-101 et seq. (1972, as amended).[1] The State sought forfeiture of property found in Jones' automobile, namely $149,700.00 in U.S. Currency, on the grounds that these funds had been used or were intended for use in drug trafficking in violation of this state's controlled substances statutes. The petition was granted. The questions before us are (1) whether the seizure of Jones, search of Jones' vehicle, and subsequent seizure of property violated the fourth amendment to the U.S. Constitution as well as Mississippi law; and (2) whether the state met its burden of proof. We affirm the forfeiture ordered by the trial court.

II.
Mississippi Highway Safety Patrol Trooper Darryl Deschamp was on patrol on Interstate 10 in Harrison County just outside of Gulfport on February 6, 1990, when he stopped Daniel Paul Jones for speeding, 74 m.p.h. in a 65 m.p.h. zone. After stopping Jones' 1989 blue Mazda, Deschamp asked Jones to step out and stand at the rear of the vehicle. Jones complied, and Deschamp began writing a citation for speeding.
While drafting the citation, Deschamp engaged in a conversation with Jones. Jones explained to Deschamp that he was *25 from Wichita Falls, Texas, and that he had been on trip to Miami, Florida, for three days for a meeting related to his father's agricultural business. Jones was not under arrest at this time. Deschamp asked Jones whether or not he had been arrested before, and Jones said that he had not ever been arrested. Deschamp at this time received a call over his radio from Gulfport dispatch. Gulfport dispatch informed Deschamp that Jones had been previously arrested and convicted in Texas on two counts of possession of a controlled substance. After Deschamp completed the citation, he gave it to Jones and asked to search the vehicle. Deschamp did not tell Jones why he wanted to search his vehicle, but he asked Jones to sign a consent form. Jones stated that he had nothing to hide and that Deschamp could search the vehicle. Deschamp testified that the basis for requesting the consent to search was that Jones was acting "nervous." Jones was still not under arrest. It is not clear from the record, but sometime between the call from Gulfport dispatch about Jones' prior conviction and Deschamp's request to search the vehicle, two other troopers, Trooper Boyd and Trooper Keel, arrived to assist Deschamp even though Deschamp had not called them. Boyd and Keel heard Jones give Deschamp verbal permission to search the vehicle. Deschamp then read the consent to search form to Jones and asked him if he understood it. Jones then read the consent to search form himself and signed it. Jones never asked for counsel and never refused to sign the form even though Deschamp advised him that he had a right to refuse. Keel signed the form as a witness. Upon cross examination, Deschamp stated that the search was not incident to arrest, not incident to a border stop, not part of a hot pursuit, not due to contraband within plain view, and not due to a smell emanating from the vehicle. Deschamp was looking for "just anything that would constitute a violation of the law."
Deschamp found a marijuana cigarette "just sitting" on the right front seat, marijuana residue "on the carpet, all over" in the trunk under the hatchback, and a large amount of cash in a piece of red luggage with marijuana residue "all over" it. During cross examination, Deschamp stated that Jones was not free to go at the time of the search. When asked, Jones admitted that the cigarette belonged to him. Deschamp discontinued the search at this point, secured the vehicle, arrested Jones for simple possession of marijuana, and Mirandized Jones for the first time by reading his rights off of a card. When asked who the money belonged to, Jones stated twice that he did not know.
Jones and his vehicle were taken to the Gulfport substation. At the substation, a more thorough search of the car was done by Deschamp and Lt. Sibley, and marijuana flakes were found under the left back seat. They also took photographs of the vehicle.
After the station search of the vehicle was complete, Jones was taken to Lt. Sibley's office. Deschamp read Jones his Miranda rights again from a card, and Jones signed the form with Lt. Sibley as a witness. Jones told the officers that the money was not his, he did not know whose it was, and he would prefer to have an attorney before he said anything else. He and his vehicle were then released to continue his trip to Wichita Falls, Texas.
The facts of the search and arrest differ somewhat according to Jones' testimony. Jones testified that he was speeding up to 69 m.p.h. to set his cruise control when he was pulled over. Jones also testified that another vehicle was pulled over along with him, but Deschamp let the other vehicle go on. Jones claimed that the only reason he signed the consent form was because Deschamp told him that if he didn't sign "that piece of paper" he would be on the side of the road all day. Jones also explained that he did not fully comprehend what he was reading when he read the form because he "was on the side of the road", "didn't have any shoes on," "had been awake for about five minutes," "was shaking because it was cold," and because "it's hard to read that thing in the wind on the side of the road with semi trucks flying by." According to Jones, he then asked for an attorney but was told he had to sign the form first. Jones signed. When Deschamp asked who *26 the money belonged to, Jones told Deschamp that he wanted to see an attorney.
Jones gave testimony that he was surrounded by seven or eight officers at the substation who were all "just continuously in a harassing state and I continuously begged for an attorney." Jones testified that he was never permitted to call an attorney and was not read his rights until Deschamp called him into an office and then "showed me out the door." On the way to his vehicle afterwards, Jones related on direct examination that Deschamp walked with him and "laughed at me and told me to come back and see him any time."
Mrs. C. Wyman Jones, a widow, gave testimony on her son's behalf. Mrs. Jones testified that the funds which were the subject of the forfeiture hearing were given by her to her son.
Mrs. Jones related that the family owned three dry cleaning plants in Wichita Falls, Texas, and further had interest in farmland in Abilene, Texas, and in Costa Rica. Mr. C. Wyman Jones' financial statement from 1987 which was produced in discovery indicated a net worth of $1,794,475.00. In 1987, Mr. C. Wyman Jones borrowed $120,000.00 from LAAD De Centroamerica S.A., an entity set up to make developmental loans in Central America. Approximately one-half of the loan was still outstanding.
Mr. C. Wyman Jones collapsed on May 31, 1989, and passed away on October 23, 1989. Mrs. Jones explained how after his death, sometime in January 1990, she sifted through two safety deposit boxes in a local bank and two different file cabinets and found $150,000.00 in cash. Mrs. Jones said that she and her son "Danny" had discussed his plans to go to south Florida to look for greenhouses and get started in the horticulture business by importing massangeana cane and distributing it himself like a broker.
Jones said he got the cash from his mother on January 31, 1990, in brown paper bags and left for Miami on February 1, 1990, to see about starting a business. Returning to Texas, Jones said he spent the night of February 5 in Gulfport, Mississippi. He was stopped by Deschamp the next morning leaving Gulfport.

III.
Jones argues on appeal that the trial court erred in its order for forfeiture because the seizure of Jones, search of his vehicle, and subsequent seizure of property violated the Fourth Amendment to the U.S. Constitution as well as section 23 of the Mississippi Constitution.
The Fourth Amendment to the United States Constitution and section 23 of the Mississippi Constitution are the foundation of Mississippi search and seizure law. The federal amendment wording is substantially the same as the State Constitution's wording.
There is a constitutional preference for searches pursuant to a warrant. The issue for consideration is whether there was valid consent so that the warrantless search was valid.
A voluntary consent to a search eliminates an officer's need to obtain a search warrant. Davis v. United States, 328 U.S. 582, 66 S.Ct. 1256, 90 L.Ed. 1453 (1946); Zap v. United States, 328 U.S. 624, 66 S.Ct. 1277, 90 L.Ed. 1477 (1946); Waldrop v. State, 544 So.2d 834 (Miss. 1989); Whittington v. State, 523 So.2d 966 (Miss. 1988); Hudson v. State, 475 So.2d 156 (Miss. 1985).
In 1973, the United States Supreme Court comprehensively addressed consent with the landmark case of Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). In Schneckloth, the Court upheld a consent to search a car given during a street encounter in which no Fourth Amendment warnings were given. The Court held that voluntariness is the pivotal determination and not whether the party knew or was informed of a constitutional right which he/she then intentionally relinquished or abandoned. Holding that voluntariness was the threshold consideration in a valid consent, the Court observed that in the consent search area there are "two competing concerns [which] must be accommodated ... the legitimate need for *27 such searches and the equally important requirement of assuring the absence of coercion." A "fair accommodation" of those competing interests, the majority concluded in Schneckloth, lies in the "traditional definition of `voluntariness'" because the requirement of a showing that the consenting party was aware of his rights would "create serious doubt whether consent searches could continue to be conducted" in light of the prosecution's difficulty in proving such awareness. Id. at 227-230, 93 S.Ct. at 2048-2049, 36 L.Ed.2d at 863-864. The Court explained:
[I]t would be thoroughly impractical to impose on the normal consent search the detailed requirements of an effective warning. Consent searches are part of the standard investigatory techniques of law enforcement agencies. They normally occur on the highway, or in a person's home or office, and under informal and unstructured conditions. The circumstances that prompt the initial request to search may develop quickly or be a logical extension of investigative police questioning. The police may seek to investigate further suspicious circumstances or to follow up leads developed in questioning persons at the scene of a crime. Id. at 231-232, 93 S.Ct. at 2050, 36 L.Ed.2d at 865.
The instant case is similar to Schneckloth because both involve consent to search a car during a street encounter. As in Schneckloth, Deschamp was conducting a consent search as a logical extension of police questioning and leads developed at the scene.
The Schneckloth Court held that "the question whether a consent to a search was in fact `voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of the circumstances." Consideration must be given to whether the circumstances were coercive, which necessitates attention to whether the person was confronted with many officers or a display of weapons, whether he was in custody and, if so, whether the circumstances of the custody were coercive, and whether the alleged consent was obtained in the course of stationhouse interrogation. Courts determining the voluntariness of a consent must assess whether the individual was immature and impressionable or experienced and well-educated, and whether that person was in an excited emotional state, mentally incompetent, or under the influence of drugs or alcohol at the time the purported consent was given. A consent is suspect if given by one who earlier refused to consent, unless some reason appears to explain the change in position. If the consent is preceded by cooperation in the investigation generally, this enhances the chances that the consent was voluntary. Id. at 226-228, 93 S.Ct. at 2047-2048, 36 L.Ed.2d at 862-863.
As a consequence of adopting the voluntariness test for consent searches, the Court concluded that "while the subject's knowledge of a right to refuse is a factor to be taken into account, the prosecution is not required to demonstrate such knowledge as a prerequisite to establishing a voluntary consent." That is, consent may be established without a showing that the police warned the consenting party of his Fourth Amendment rights or that he was otherwise aware of those rights. Id. at 249, 93 S.Ct. at 2059, 36 L.Ed.2d at 875. In the case sub judice there is ample evidence that the defendant was informed of his right to refuse to consent to the search.
More recently, the United States Supreme Court noted that it would be unrealistic to characterize every encounter between a citizen and a police officer as a seizure. United States v. Mendenhall, 446 U.S. 544, 555, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497, 509 (1980).
Thus, whether the consent was voluntarily given by Jones is a question of fact to be determined by the total circumstances. Jones has not put on proof of duress or coercion, express or implied. He has not claimed that he was confronted by many officers on the side of Interstate 10 or by a display of weapons. Jones does not complain in his testimony about the presence of the two other troopers at the scene. Jones does not claim he was immature, *28 impressionable, incompetent, or under the influence of drugs or alcohol. There is nothing in the record to suggest such a disposition. Jones does claim that he was cold and barefoot and told to sign if he didn't want to be on the side of the road all day. Deschamp testified that Jones never asked for an attorney and denied that he threatened to keep Jones all day in order to obtain a warrant. The only evidence Jones has put on to support his contention is his own testimony, which the trial judge questioned as to veracity. The trial judge has sole authority in determining witness credibility. Such a determination should not be overturned without a substantial showing that the trial judge was manifestly wrong. Mullins v. Ratcliff, 515 So.2d 1183, 1189 (Miss. 1987).
This Court has also addressed valid consent. In Jackson v. State, 418 So.2d 827 (Miss. 1982), this Court looked to voluntariness. This Court recognized the federal standard and held that when there is conflicting testimony about whether consent was voluntary, the trial judge is the evaluator of witness credibility. In Jackson, this Court recognized that it was in no position to hold that the trial judge erred. Id. at 830. In the case at bar, Jones gave testimony that conflicted with the prosecution's witnesses, which Judge Thomas evaluated. The judge found that there was voluntary consent, and there is nothing in the record to suggest that Judge Thomas was wrong.
In Penick v. State, 440 So.2d 547 (Miss. 1983), this Court appears to give greater protection than the United States Supreme Court has given under consensual search law:
We accord to the U.S. Supreme Court the utmost respect in its interpretation of the U.S. Constitution. We must, however, reserve for this Court the sole and absolute right to make the final interpretation of our state Constitution and, while of great persuasion, we will not concede that simply because the U.S. Supreme Court may interpret a U.S. Constitutional provision that we must give the same interpretation to essentially the same words in a provision of our state Constitution. Id. at 551.
This Court then held that consent is valid if there was knowledgeable as well as voluntary waiver of a party's constitutional right not to be searched. Id. Knowledgeable consent is defined as consent where the defendant knows that he/she has a right to refuse, cognizant of his/her rights in the premises. Id. at 549-550.
In the case at bar, however, Jones never claimed that his consent was not knowledgeable. He did not deny reading and understanding the consent form. He only makes a few weak assertions that sound like assertions of duress, which Judge Thomas dismissed. Jones' consent is valid under the Penick test of knowledgeable consent. This Court would hold that consent is not valid where the consenter is impaired or has a diminished capacity; otherwise we apply the same test for valid consent as the federal standard and place the burden on the defendant to show impaired consent or some diminished capacity. Consent must be voluntary and absent diminished capacity in order to be valid.
The State is not required to demonstrate knowledge. Schneckloth, 412 U.S. at 249, 93 S.Ct. at 2059, 36 L.Ed.2d at 875.
Jones argues that he was illegally seized prior to the search. There is nothing in the record to suggest that this was anything more than a routine traffic stop. Deschamp did state that Jones was not free to go, but no citizen is free to go when stopped for a traffic violation. After writing the citation, Deschamp gave Jones his license back and the ticket. The conversation then became consensual. The fact that one of the men was a police officer does not make that a seizure. United States v. Mendenhall, 446 U.S. at 554, 100 S.Ct. at 1876-1877, 64 L.Ed.2d at 508-509. There is no indication in the record that Jones was not free to go after the citation was completed.
Finally, Jones contends that consent must be predicated on the Miranda warning being given prior to the search. Consent must be predicated on Miranda *29 warnings being given prior to the search only when consent is given after a detention, illegal or otherwise, such as being taken to the police station. See Florida v. Royer, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983); United States v. Luton, 486 F.2d 1021 (5th Cir.1973); McCray v. State, 486 So.2d 1247 (Miss. 1986); Luton v. State, 287 So.2d 269 (Miss. 1974). Certainly, Jones was entitled to Miranda warnings, but the warnings were timely given in the case at bar. He was Mirandized after being detained. We do not require that Miranda warnings precede a consent search.

IV.
Jones also argues on appeal that the trial court erred in its order for forfeiture because the State did not meet its burden of proof pursuant to the Mississippi Uniform Controlled Substance Law.
Forfeiture of "all money" used or intended for use in violation of Mississippi's Uniform Controlled Substance Law is provided for in Miss. Code Ann. § 41-29-153(a)(5) and § 41-29-153(a)(7) (1972, as amended). Jones violated § 41-29-139 (1972, as amended) of the Mississippi Uniform Controlled Substance Law which provides that:
(a) Except as authorized by this article, it is unlawful for any person knowingly or intentionally: (1) To sell, barter, transfer, manufacture, distribute, dispense or possess with intent to sell, barter, transfer, manufacture, distribute or dispense, a controlled substance ...
This Court has held that the burden is on the State to prove forfeiture by a preponderance of the evidence. Saik v. State, ex rel. Mississippi Bureau of Narcotics, 473 So.2d 188, 191 (Miss. 1985). The State must prove that it is more likely than not that the currency was possessed by the claimant with the intent to be used in connection with an illegal narcotics trafficking scheme. Reed v. State, 460 So.2d 115, 118 (Miss. 1984). The forfeiture can be based on wholly circumstantial evidence and inference. Id. at 118. This Court explained in Reed that a connection with narcotics trafficking can stem from the sheer quantity of currency. Id.
Marijuana and marijuana residue were found throughout the vehicle belonging to Jones. Jones admitted that the marijuana belonged to him. Jones clearly violated the Mississippi Uniform Controlled Substance Law. Jones told the Court that he grew marijuana in Texas. Jones was stopped on his way back from a known drug trafficking city, Miami. The court below found Jones' testimonial evidence "inconceivable and unbelievable" and of doubtful "veracity." Clearly, it is more likely than not that the currency was used in connection with an illegal narcotics trafficking scheme. This is the only showing necessary for forfeiture. There does not need to be an absence of reasonable doubt or some other higher standard of proof. Although mere suspicion is inadequate to support a forfeiture, Ervin v. State of Mississippi, ex rel. Mississippi Bureau of Narcotics, 434 So.2d 1324 (Miss. 1983), there is more than mere suspicion that Jones was engaged in drug trafficking.
The State demonstrated that the currency is forfeitable under Mississippi law. And Jones failed to rebut the "close proximity" presumption of forfeitability provided for in Miss. Code Ann. § 41-29-153(a)(7) (1972, as amended) which provides:
... All moneys, coin and currency found in close proximity to forfeitable controlled substances, to forfeitable drug manufacturing or distributing paraphernalia, or to forfeitable records of the importation, manufacture or distribution of controlled substances are presumed to be forfeitable under this paragraph; the burden of proof is upon claimants of the property to rebut this presumption.
Jones has not given any testimony as to why a large amount of cash was in close proximity to a forfeitable controlled substance. Clearly, § 41-29-153(a)(7) places the burden upon Jones to rebut the close proximity presumption of forfeitability. Jones has not denied that the money was in close proximity to a controlled substance and has not explained why it was in close proximity.
Although this Court has not interpreted "close proximity" under § 41-29-153(a)(7), other states have interpreted similar statutes, *30 as the State delineates in its brief. The Arkansas Supreme Court explained that "close proximity" means "very near." Limon v. State, 285 Ark. 166, 685 S.W.2d 515, 516 (1985). And an Illinois appellate court commented that the close proximity presumption compels a trier of fact to find for the State when there is no evidence of rebuttal. People ex rel. Daley v. $9,403 in U.S. Currency, 131 Ill. App.3d 188, 86 Ill. Dec. 904, 907, 476 N.E.2d 80, 83 (1985).
Since marijuana was found in the Jones suitcase as well as the money, the money was certainly "very near" the controlled substance. And Jones has not explained the close proximity.

V.
Because the search and seizure was not unconstitutional and because the funds fall within the purview of forfeitable funds pursuant to Mississippi law, we affirm the forfeiture as ordered by the lower court.
AFFIRMED.
ROY NOBLE LEE, C.J., and PRATHER, ROBERTSON, SULLIVAN and BANKS, JJ., concur.
HAWKINS, P.J., concurs in result only.
DAN M. LEE, P.J., and McRAE, J., dissent without separate written opinion.
NOTES
[1] We note that forfeiture of money and property is widespread, especially in drug related cases. We urge courts and other proper authorities to attach appropriate accounting and management procedures in regards to forfeited goods.