# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2021-CA-00692-COA

**FORTY-ONE THOUSAND EIGHTY DOLLARS ($41,080.00) IN UNITED STATES CURRENCY AND PABLO MENDEZ, JR.**                    APPELLANTS

**v.**

**STATE OF MISSISSIPPI EX REL. BRANDON POLICE DEPARTMENT**                    APPELLEE

DATE OF JUDGMENT:             05/25/2021
TRIAL JUDGE:                  HON. M. BRADLEY MILLS
COURT FROM WHICH APPEALED:    RANKIN COUNTY CIRCUIT COURT
ATTORNEYS FOR APPELLANTS:     JAD JAMAL KHALAF
                              MERRIDA COXWELL
                              AMMIE THI NGUYEN
ATTORNEYS FOR APPELLEE:       CHRISTOPHER TODD McALPIN
                              JOEY WAYNE MAYES
                              MICHAEL SHELTON SMITH II
NATURE OF THE CASE:           CIVIL - OTHER
DISPOSITION:                  AFFIRMED - 11/22/2022
MOTION FOR REHEARING FILED:

**BEFORE BARNES, C.J., McDONALD AND McCARTY, JJ.**

**BARNES, C.J., FOR THE COURT:**

¶1.     On February 25, 2018, Sergeant Joseph French executed a traffic stop after observing a vehicle with an unreadable paper license tag traveling westbound on Interstate 20 (I-20). The driver of the vehicle was the appellant, Pablo Mendez Jr. Sergeant French, a narcotics officer with the Brandon Police Department, smelled "raw marijuana coming from [the] inside of the vehicle" while talking with Mendez through the open window. The officer also observed money secured by rubber bands in Mendez's lap. Mendez told the officer that he

had been visiting a friend in Myrtle Beach, South Carolina, and was headed home to Dallas, Texas. Mendez eventually admitted to having a small amount of marijuana in the vehicle, which the officer located in a bookbag on the front passenger seat. Although Mendez initially denied there was any additional currency in the car, Sergeant French discovered $41,080, which was sealed in Ziploc bags and concealed in the lining of a coat hanging on the driver's seat. Sergeant French determined that the vehicle had been registered to Mendez for only a few days before the traffic stop. Mendez was taken to the police station and questioned further. A K-9 unit alerted police that the $41,080, which police had hidden in a box, indicated the presence of drugs; so the funds were confiscated. The police issued Mendez a misdemeanor citation for the marijuana and released him.

¶2. On February 28, 2018, the State filed a petition seeking forfeiture of the $41,080 in seized funds under the Mississippi Uniform Controlled Substances Law. Miss. Code Ann. §§ 41-29-101 to -191 (Rev. 2018). The petition averred that Mendez had "denied any knowledge of the U.S. Currency and stated that the coat did not belong to him . . . but was left in his vehicle by a hitchhiker that he had earlier picked up."

¶3. Mendez filed his affirmative defenses on March 26, 2018, and the parties engaged in written discovery.[1] On May 8, 2019, Mendez pled guilty to a misdemeanor drug-possession

---

[1] The named defendant in the State's petition was "Forty One Thousand Eighty Dollars ($41,080.00) in United States Currency." Mendez was listed as the person in possession of the currency, not the owner. But for all intents and purposes, Mendez is the only named party/claimant/appellant.

charge. Because this was his first offense, the charge was non-adjudicated and dismissed by the municipal court of the City of Brandon, Mississippi.[2]

¶4. On September 9, 2019, the State filed a motion for summary judgment and an application for entry of a default judgment. The Rankin County County Court entered a default judgment of forfeiture on September 17, 2019, against the "unknown owner" of the seized funds because the owner had "failed to plead or otherwise defend" in the action. In November 2019, the State and Mendez subsequently filed a joint ore tenus motion to set the matter for hearing on January 22, 2020, which the county court granted.

¶5. At trial, the State put on testimony from Sergeant French, Agent James Schuler, and Officer Jon Cooley. Deputy William Picou also testified as an expert in the fields of criminal interdiction, drug trafficking, and canine handling. In his testimony, Sergeant French explained that the reason for the traffic stop was due to his concern that the vehicle's paper tag was about to fly off. The officer's "dashcam" video was admitted into evidence and played for the court. Mendez had told Sergeant French that he was returning from visiting a friend in Myrtle Beach, South Carolina, whose dad was in hospice and that he had stayed the night before (Saturday) in Birmingham, Alabama. Sergeant French said he "pick[ed] up on some deception" in Mendez's travel story, explaining:

> [Mendez] was basically giving me what I believed at that point in time to be
> a rehearsed story because instead of just saying, no, I'm coming back from

---

[2] The municipal court ordered Mendez to pay a fine of $1,166 and complete a first-time offender drug program.

Myrtle Beach. He also threw in something to say that I would sympathize more with him while he was on his travels. Something we normally see in the drug trafficking. Yes, it's some of the trade craft that they use.

When Sergeant French commented on the marijuana smell, Mendez initially claimed that he had a vape pen. But after further questioning, Mendez "admitted to having a small personal amount of marijuana in the vehicle," which the officer found in a bookbag on the front passenger seat. Sergeant French asked Mendez if he had any other drugs, guns, or large sums of United States currency in the vehicle; Mendez said no.

¶6. Regarding the vehicle's paper tag, Sergeant French testified that "[t]he vehicle was purchased either Wednesday or Thursday prior to the stop." The officer further noted that Mendez had been "issued a tag, an actual license plate for the vehicle that they sent him." This tag, however, had been swapped out after a traffic stop in another state, which the officer noted was indicative of the drug trade:

Like I was saying, he had the K tag, and shortly after the Louisiana stop the plate was switched and the registration. He was able to obtain an L tag which would be the next letter that's sequentially issued for the State of Texas.

We normally see that as drug trade craft because of modern technology, and [license plate readers] are set up in most states. They'll swap the registrations and tags in order to defeat law enforcement so that they don't see that it's the same person that's traveling.

While conducting a pat-down search of an extra-large coat hanging on the driver's seat, Sergeant French noted what felt like "a large sum of money that was hidden inside of the liner of the jacket." Two packages were inside the coat's zippered lining: "One of them was a vacuum sealed bag full of currency and the other one was a gallon[-]size [Z]iploc[] bag full

4

of currency. . . . [T]he currency was secured together by rubber bands and . . . the majority of the currency was in smaller denominations." Mendez had denied "having any large sums of U.S. currency in the vehicle." He claimed that a female hitchhiker had left the coat in his car. There was also "a paper bag that contained some CBD products" on the floorboard of the back seat, along with a receipt from North Carolina.

¶7. On cross-examination, Sergeant French acknowledged that Mendez was not a felon nor had any outstanding warrants, but the sergeant explained that "money couriers" for drug trafficking typically had "clean backgrounds" to make it "harder for law enforcement to seize those funds."

¶8. Agent Schuler, a certified K-9 handler, testified that Sergeant French asked him to "assist in searching the car and [to] run [his] dog on the currency." Four cardboard boxes were placed around a room at the police station, with the $41,080 in currency placed in one of the boxes by Sergeant French. The other boxes were empty. Agent Schuler's K-9, Max, "alerted [him] to the box that the money was in." Agent Schuler admitted that he had no knowledge of where the boxes were obtained.

¶9. Officer Cooley, an investigator with the Madison Police Department, testified that Sergeant French contacted him about the traffic stop and the discovery of the drugs and currency. Officer Cooley questioned Mendez, who claimed "that he was employed with a job at the [Dallas] Cowboy[s'] stadium." When Officer Cooley asked Mendez about the currency discovered in the vehicle, Mendez told him that a hitchhiker had left her jacket in

his car, which the officer "believed to be a pretty comical story[.]" The officer explained that it was common for couriers to attempt to distance themselves from any currency or drugs. For example, when asked about the receipt from North Carolina, Officer Cooley testified that "drug traffickers" will often "try to, you know, distance themselves" from a place that law enforcement might "know is a source city."

¶10.    Deputy Picou was accepted by the county court as an expert in criminal interdiction, drug trafficking, and canine handling.[3] He testified that Interstate 20 is a major thoroughfare "for illegal drugs coming from the southwest border coming across [Mississippi] headed to the east coast." The deputy also noted that license plate readers cannot pick up a paper license tag. With regard to the packaging of the currency, Deputy Picou testified:

> [I]t was vacuum sealed, one package vacuum sealed, one package in a [Z]iploc[] bag, all which were contained with rubber bands holding the money together. What makes that significant is that drug traffickers feel like if they can mask the odor that's on the money, then if a dog comes around they won't be able to smell it, so that's the purpose of vacuum sealing the money. What this tells me is he's got two different types. It was probably two different pick ups from two different organizations. One vacuum sealed it; one didn't.

Given all the factors surrounding Mendez's traffic stop, Deputy Picou opined that Mendez was a drug courier.

¶11.    When asked by Mendez's attorney if the currency was the only thing that made the deputy suspicious of "illegal drug activity," Deputy Picou further testified:

---

[3] Although Mendez's attorney objected to the court's admission of Deputy Picou as an expert witness, Mendez has not raised any assignment of error as to the deputy's expert qualifications.

So first of all, right off the bat[,] we've got an odor of marijuana coming from the vehicle. The small amount of marijuana that [Sergeant French] found I wouldn't think would be able to be detected by a human just walking up to a vehicle because, you know, it was raw marijuana. You can't - - it would have to be a substantial amount for [Sergeant French] to smell unless it was right there close to him.

The turn[-]around trip [to South Carolina] was another indicator. You know, when [Sergeant French] was asking him on the video about the marijuana, [Mendez] finally admitted to the marijuana. Then he started asking him about other drugs. If you watch the video[, Mendez] is shaking his head, no, no, no, no, no.

What about U.S. currency? He don't shake his head. He just says no. Totally different response. So that tells you right there he's hiding something. And so that would be an indicator to me.

So once Sergeant French started searching, which he had the probable cause to do because of the odor, and he finds the money, which [Mendez] says that he doesn't have any, hidden in a jacket. If I've got $41,000[,] I'm going to tell you I've got it. If I have it hidden, I'm going to tell you where it is because it's my money.

But he's trying to distance himself from it from the get go, from the very beginning. He doesn't want nothing to do with that money, and he tells you I don't know anything about that money.

Deputy Picou also explained that "quick turn-around trips" are "common" in the drug trafficking trade. The deputy concluded that "when I have indicators, as many as I do with this stop, then that tends to lead me to know that this guy fits a drug courier profile."

¶12. After the State rested, Mendez testified. As a resident of Dallas, Texas, he said that for the last ten years, he had worked as a beer vendor or bartender at various sports venues in the Dallas area, as well as festivals. Mendez said he frequently was paid in cash and never carried a wallet. He said that he filed his taxes in 2015, 2016, and 2017 but admitted that he

7

did not pay taxes on his cash tips. The tax returns, however, were not introduced into evidence.

¶13.    Mendez said he had "set aside" the $41,080 to keep his (now) ex-wife from mismanaging their money. To explain why the currency was sealed in bags, Mendez claimed that the money was hidden in his garage, and he needed to protect it from rodents. Mendez later admitted on cross-examination, however, that he had had an individual bank account since 1998; so he had a way to put money where his ex-wife could not access it.

¶14.    Mendez testified that he had leased the vehicle and went to visit his friend in South Carolina on the weekend in question after he discovered his wife had been cheating on him. Mendez admitted that the coat concealing the sealed bags of money was his. He lied to the police about the hitchhiker because he "was scared" and worried because he had not paid taxes on that money.

¶15.    With regard to the marijuana found in the car, Mendez claimed, "I didn't even remember I had it[,] and then I said yes because I had partaked with my friend that day in Myrtle Beach." Presumably in an effort to explain why there was a receipt from North Carolina in the vehicle, Mendez said that he initially headed to North Carolina, thinking he would go home through Memphis, but he later decided to go home through Atlanta and Birmingham instead. He denied that the $41,080 was from the sale of illegal narcotics.

¶16.    Mendez said that he felt like he was being racially profiled by the police. He testified that an officer was "screaming" at him and "drilling me on my work and saying that I wasn't

8

a bartender and that I was a drug carrier." Mendez acknowledged on cross-examination, however, that Sergeant French had been very polite to him, as evidenced by the dashcam video. Mendez also admitted that the police released him that day and allowed him to take his vehicle.

¶17. In his bench ruling, the county court judge said that he did not "believe a word of [Mendez's] testimony," finding:

> [I]t is hard to overcome the fact that you're a liar. . . . And you've got no proof, no paperwork or anything except a bunch of bogus IRS tax returns that you apparently think are going to prove to me that you have that money. . . . I don't think there's any question that you were carrying the proceeds of a drug transaction. The quick turn around straight up to South Carolina from Dallas and back toward Dallas – you didn't make it all the way[;] that's classic drug courier profile activity.
>
> . . . .
>
> You can't expect me to really believe that you had saved up $40,080 [sic] from all this money you've made when you haven't been paying taxes on it or anything else. It's just outrageous, and so I want the appellate court to know that I find and based on your demeanor on the stand, the way you answered the questions, the fact that you danced around everything that didn't fit right with your lies, I don't find any credibility in your story at all.

Although recognizing that the State's standard of proof was by a preponderance of the evidence, *see* Miss. Code Ann. § 41-29-179(2) (Supp. 2017), the county court determined that the State had proved that Mendez was a drug courier "by clear and convincing evidence." Therefore, the court granted the State's petition for forfeiture.

¶18. Mendez appealed the county court's ruling to the Rankin County Circuit Court, which affirmed the decision on May 25, 2021. The circuit court determined that the county court's

9

order was "supported by substantial evidence" and that its findings were "not manifestly wrong or clearly erroneous." Further, the circuit court held that "[b]ased on the evidence found to be most credible," the entirety of the funds should be forfeited as proceeds from drug transactions and that the forfeiture of the entire amount was "not grossly disproportionate or an excessive fine."

¶19. Aggrieved, Mendez argues that (1) the State failed to prove the seized funds were in violation of the Mississippi Controlled Substances Law or were in close proximity to the controlled substances found; (2) the funds had been placed in random boxes at the police station and were "contaminated"; (3) the forfeiture was "grossly disproportionate" under the applicable instrumentality and proportionality tests; and (4) the State failed to prove that he was a drug courier or fit the drug courier profile.

¶20. When reviewing the circuit court's order on appeal from the county court, we recognize that "the county court sits as the fact-finder"; therefore, "the circuit court and this Court, as appellate courts, 'are bound by the judgment of the county court if supported by substantial evidence and not manifestly wrong.'" *Turnage v. Brooks*, 301 So. 3d 760, 763 (¶9) (Miss. Ct. App. 2020) (quoting *Bacallao v. Madison County*, 269 So. 3d 139, 144 (¶21) (Miss. Ct. App. 2018)). We further afford "the judgment of a circuit or county court in a non-jury trial . . . the same deference on appeal as a chancery court decree." *Id*. at 763-64 (¶9) (quoting *Bacallao*, 269 So. 3d at 144 (¶21)). In forfeiture cases, "the appropriate standard of review . . . is the familiar substantial evidence/clearly erroneous test." *In re One*

*Hundred Thirty-Seven Thousand Three Hundred Twenty-Five Dollars ($137,325.00) in U.S.*

*Currency v. State*, 204 So. 3d 317, 323 (¶22) (Miss. Ct. App. 2016) ("*Bobo*"). Therefore, a

trial court's findings will not be disturbed on appeal "unless it has applied an erroneous legal

standard to decide the question of fact." *Id*. Giving deference to the county court as the fact-

finder, and finding the court's ruling is supported by substantial evidence, we affirm the

circuit court's affirmance of the county court's judgment.

**DISCUSSION**

**I.  Whether the funds were subject to forfeiture under Mississippi Code Annotated section 41-29-153(a)(5) or (7).**

¶21. The State filed a petition for forfeiture of the money under Mississippi Code

Annotated subsections 41-29-153(a)(5) and (a)(7) (Supp. 2017). Subsection (a)(5) provides,

in pertinent part, that "[a]ll money . . . used, or intended for use, in violation of this article

or in violation of Article 5 of this chapter" is subject to civil forfeiture. "[T]he burden is on

the State to prove forfeiture by a preponderance of the evidence." *Neely v. State*, 628 So. 2d

1376, 1381 (Miss. 1993) (citing *Jones v. State*, 607 So. 2d 23, 29 (Miss. 1991)). In *Neely*,

the Mississippi Supreme Court noted that Mississippi "does not favor forfeitures, and, before

forfeitures will be decreed or adjudged, they must come within the terms of the statute

imposing that liability." *Neely*, 628 So. 2d at 1381 (citing *Reed v. State*, 460 So. 2d 115, 118

(Miss. 1984)). However, the supreme court later clarified:

> It is not accurate to say that we do not favor forfeiture. What we do favor is
> a careful and correct application of the law and we do not hold forfeiture in
> favor or disfavor. It is a tool of public protection, a tool of law enforcement

11

and forfeiture is precisely mandated by statute and when the statute is carefully and correctly followed we will favor such forfeiture and when the statute is not followed or supported by necessary evidence we will disfavor such forfeiture.

*One Hundred Seven Thousand Dollars ($107,000.00) U.S. Currency (Tagle) v. State*, 643 So. 2d 917, 920 (Miss. 1994).

¶22. "[A]n analysis of whether money is subject to forfeiture is grounded in a 'totality of the circumstances.'" *Ruiz v. State*, 227 So. 3d 1132, 1135 (¶17) (Miss. Ct. App. 2016). Citing *Ruiz*, Mendez argues that the totality of the circumstances in this case does not support the court's finding that the State proved the funds were subject to forfeiture. Police officers in *Ruiz* discovered "$56,000 in cash, along with a vacuum-sealer machine, vacuum-seal bags, and Saran Wrap" hidden in a secret compartment in Apolinar Ruiz's vehicle. *Id.* at 1133 (¶¶5-6). Some residue was also noted in the compartment but it "was not preserved, collected, or tested." *Id.* at 1134 (¶6). Ruiz consistently maintained that the money was his, even averring at trial that he had been saving the money for over twenty-six years. *Id.* at (¶¶7, 10). Ruiz was not charged with any crime related to the traffic stop, nor did he have a prior criminal history. *Id.* at 1136 (¶18). This Court noted that Ruiz had "plausible explanations" for traveling to Texas, as well as the existence of the vacuum-seal items (i.e., he was a diabetic and wanted to save meals for himself). *Id.* at 1136 (¶18). Thus, we concluded that although "many factors in Ruiz's situation g[a]ve rise to an element of suspicion," they did not "support a reasonable belief that the totality of the circumstances shows, by a preponderance of the evidence, that the money in question was used in exchange

12

for drugs." *Id*. at 1137 (¶23).

¶23. There are a few factors distinguishing the facts in *Ruiz* from the present case. Here, Mendez was criminally charged with a misdemeanor for possessing a small amount of marijuana. He entered a guilty plea, and the charge was non-adjudicated because he was a first-time offender. Additionally, Mendez's statements to law enforcement after his traffic stop were inconsistent with his subsequent trial testimony. Mendez told Sergeant French he had been visiting a friend in South Carolina, whose father was in hospice. At trial, however, he claimed he visited his friend to get away because his wife was cheating on him.

¶24. Mendez also lied to the police about the seized funds. First, he denied there was any currency in the car. Once the officer discovered the $41,080, Mendez again lied when he claimed the coat belonged to a hitchhiker. It was only after the State filed the petition for forfeiture that Mendez claimed ownership of the $41,080. He explained at trial that the currency had been sealed because it had been stored in his garage—an explanation that the county court judge, sitting as the fact-finder, evidently found not plausible.

¶25. Admittedly, the supreme court determined in *Hickman v. State*, 592 So. 2d 44, 47 (Miss. 1991), that a trial court "had no authority to order [the claimant's] money forfeited because he took the witness stand and lied[,] . . . [n]or can the [S]tate take his money because the proof powerfully suggests he and [his companion] were certainly 'up to something.'" Nevertheless, the *Hickman* court found that there was "substantial, credible, relevant evidence from which the Circuit Court may have" found that the "funds were the product of

13

or instrumentalities of violations of this state's controlled substances act."[4] *Id*. at 48. Of significance to this case, the supreme court also recognized in *Hickman* that the State's expert witness "was not asked his opinion on the ultimate issue[—]were these funds the product of drug trafficking? Nor was he asked whether Hickman fit a drug courier profile." This distinction ties into Mendez's final argument raised in his appeal—that "the State failed to prove that [Mendez] was a drug courier or fit the drug courier profile."

¶26. In order to meet the necessary burden of proof for forfeiture, "[t]he State must prove that it is more likely than not that the currency was possessed by the claimant with the intent to be used in connection with an illegal narcotics trafficking scheme." *Jones*, 607 So. 2d at 29 (citing *Reed*, 460 So. 2d at 118). We find *Bobo* instructive in our analysis of this issue. In *Bobo*, police officers discovered $137,325 hidden in a secret compartment in the trunk of Bobo's vehicle. *Bobo*, 204 So. 3d at 325 (¶31). As in this case, the State presented expert testimony "in the methods, techniques, instrumentalities, procedures, and practices utilized by drug traffickers and couriers in transporting, concealing, and storing drugs and drug proceeds." *Id*. at 319 (¶9). The expert discussed the various indicators consistent with drug trafficking (e.g., air fresheners, traveling cross-country with just one small backpack, and the packaging of the money). *Id*. at 320 (¶¶9-11). Specifically, we noted that the State had presented testimony by an officer, "testifying as an expert in the field of drug trafficking and

---

[4] There was a loaded gun, duct tape, and bags with marijuana residue in the vehicle, along with the $16,700 in funds. *Hickman*, 592 So. 2d at 45. Also, as in this case, a small amount of marijuana was found in the claimant's luggage. *Id*.

criminal interdiction," regarding "the drug-courier profile[,] and [he] explained the relationship each item inside Bobo's vehicle possessed to the drug-courier profile." *Id*. at 323 (¶23). "Considering the large sum of money discovered in the hidden compartment of Bobo's vehicle, as well as the testimony of the State's witnesses linking the circumstances of this case to the furtherance of a drug-trafficking operation," we concluded there was "substantial evidence" to support the forfeiture. *Id*. at 326 (¶36).

¶27. Like the driver in *Bobo*, Mendez was traveling westbound along I-20. Deputy Picou, the State's expert witness, testified that I-20 was a "main thoroughfare" for illegal drugs "headed east from source cities to other source cities, U.S. currency which travels back west to get back to the border." The deputy also noted that Mendez's "recently purchased vehicle" is something that law enforcement "sees quite often on [I-20]." He further explained:

> A lot of organizations will buy them a vehicle and register it to them so that they can transport just – that's what that vehicle is strictly for. So we've seen that a lot where the cartels will do that, buy the vehicle and register it in that person's name because they know that it may throw up a flag if we stop them and it's registered to somebody else that they don't know.

Deputy Picou also said that paper tags are used by drug couriers to try to "defeat" the license-plate-reading "technology" used by the police. Another indicator of a drug courier profile noted by the deputy concerned Mendez's "quick turn-around trip" to South Carolina, "a seventeen hour drive."

¶28. Regarding the small amount of currency that Mendez had in his lap, Deputy Picou testified, "The cases I've worked in the past, they'll want to distance themselves from the

15

bulk of the currency, but what they have on them[,] they'll claim that." He also noted that the packaging of the $41,080 was consistent with a drug courier profile and that Dallas was a "source city" for drugs. Thus, addressing this "ultimate issue," Deputy Picou definitively opined that "when I have indicators, as many as I do with this stop, then that tends to lead me to know that this guy fits a drug courier profile." Further, as we will discuss in greater detail in Part II of this opinion, the K-9 unit noted the presence of drugs on the seized funds.

¶29.    In *Jones*, the supreme court held that "the only showing necessary for forfeiture" is whether "it is more likely than not that the currency was used in connection with an illegal narcotics trafficking scheme." *Jones*, 607 So. 2d at 29. Thus, in determining whether funds are subject to forfeiture, this Court "must decide 'whether, given all of the evidence considered together, a rational trier of fact may have found by a preponderance of the evidence that the funds were the product of or instrumentalities of violations of this state's controlled substances act." *Cowan v. Miss. Bureau of Narcotics*, 2 So. 3d 759, 765 (¶21) (Miss. Ct. App. 2009) (quoting *Hickman*, 592 So. 2d at 48). "The trier of fact may act on circumstantial evidence and inferences as well as direct evidence." *Id*. (citing *Hickman*, 592 So. 2d at 46); *see also Jones*, 607 So. 2d at 29 (noting that "[t]he forfeiture can be based on wholly circumstantial evidence and inference"). We find the totality of the circumstances supports the court's ruling that the State had met its burden of proof that the seized funds "were the product of or instrumentalities of violations of this state's controlled substances act."

¶30. Mendez also contends the State failed to meet its burden of proof that the seized funds were found in close proximity to controlled substances. Subsection 41-29-153(a)(7) provides, in part, that:

> [a]ll monies, coin and currency found in close proximity to forfeitable controlled substances, to forfeitable drug manufacturing or distributing paraphernalia, or to forfeitable records of the importation, manufacture or distribution of controlled substances are presumed to be forfeitable under this paragraph; the burden of proof is upon claimants of the property to rebut this presumption.

While our courts have not defined the phrase "close proximity" in terms of a specified distance, it is generally "understood to mean 'very near.'" *Murshid v. State,* 258 So. 3d 288, 291 (¶9) (Miss. Ct. App. 2018). "However, where it is established that the drugs and money were not in close proximity, the presumption does not arise." *Neely,* 628 So. 2d at 1381. The *Neely* court further clarified that "in the absence of direct proof of trafficking, where there is uncontradicted proof of an alternate source, the statutory presumption has been rebutted and disappears." *Id.* at 1381-82 (emphasis added). In *Neely,* law enforcement found drugs in a matchbox in Neely's car, and money was later discovered on Neely's person after a search at the jailhouse. *Id.* at 1377-78. The supreme court reversed and rendered the judgment of forfeiture, as there was "no direct proof that the money in question [was] forfeitable." *Id.* at 1382.

¶31. The State distinguishes the supreme court's holding in *Neely* due to the "expert testimony [in this case] that Mendez was a drug courier transporting drug proceeds used or intended to be used in violation of the Mississippi Uniform Controlled Substances Laws."

17

Because the totality of the circumstances supports a finding that the funds were an instrumentality of drug trafficking, *see supra* ¶¶28-29, we agree with the State that the issue of whether the drugs were in "close proximity" is not relevant to the county court's ruling in this instance. We therefore find Mendez's argument unpersuasive.

## II. Whether the seized funds had been contaminated.

¶32. At the police station, four empty cardboard boxes were placed around the office by Sergeant French. Agent Schuler's K-9 unit "Max" was then allowed to sniff the boxes. Max detected the $41,080 in one of the boxes, signifying a presence of drugs on the money. Agent Schuler testified that he had no knowledge as to where the boxes were taken from or what had been in the boxes.

¶33. Our Court previously has determined that "there is some indication that residue from narcotics contaminates as much as 96% of the currency currently in circulation." *Evans v. City of Aberdeen*, 925 So. 2d 850, 855 (¶20) (Miss. Ct. App. 2005) (quoting *United States v. $5,000.00 in U.S. Currency*, 40 F.3d 846, 849 (6th Cir.1994)), aff'd on other grounds, 926 So. 2d 181, 183 (¶3) (Miss. 2006). The supreme court subsequently rejected this "currency contamination" theory, however, and instead adopted "the Seventh Circuit's sound reasoning . . . that dog alerts to currency are entitled to probative weight." *Evans*, 926 So. 2d at 185 (¶11) (citing *Funds in the Amount of Thirty Thousand Six Hundred Seventy Dollars ($30,670)*, 403 F.3d 448, 455-60 (7th Cir. 2005)). Mendez agrees that the dog's alert "was entitled to probative weight," but he also contends that the "contamination theory is

18

applicable because the dog alert was coupled with other persuasive evidence, namely the random four boxes that were found somewhere in the police station."

¶34. We find no merit to Mendez's argument. Deputy Picou, a certified K-9 trainer, testified at trial that there was no "study" or "foundation" to support "that our currency is littered with traces of drugs." He further clarified "that if we take money that is contaminated, within a few days that contamination is gone. So it has to be something that is fairly recent for the dogs to – for it to trigger an alert in the dogs." There was no evidence presented that the empty boxes were contaminated, and we find nothing to suggest that the "free air sniff" done by the K-9 was improper in this instance. It was simply one factor, entitled to probative weight, for the court to consider in the totality of the circumstances.

### III. Whether the forfeiture was "grossly disproportionate" under the applicable instrumentality and proportionality tests.

¶35. In 1998, the Mississippi Supreme Court instituted a four-element test in two companion cases—*One (1) Charter Arms, Bulldog 44 Special, Serial No. 794774 v. State*, 721 So. 2d 620, 624-25 (¶19) (Miss. 1998), and *One (1) 1979 Ford v. State*, 721 So. 2d 631, 636 (¶13) (Miss. 1998)—to determine whether a forfeiture is lawful or excessive:

> (1) The nexus between the offense and the property and the extent of the property's role in the offense;
>
> (2) The role and culpability of the owner;
>
> (3) The possibility of separating the offending property from the remainder; and
>
> (4) Whether, after a review of all relevant facts, the forfeiture divests the

19

owner of property which has a value that is grossly disproportionate to the crime or grossly disproportionate to the culpability of the owner.

Therefore,

[t]he analysis under the proportionality test that we employ here is two-part. First, under the "instrumentality" (or "nexus") test, the forfeited property must have a sufficiently close relationship to the illegal activity. Second, under the "proportionality" test, forfeiture of the property must not impose upon the owner a penalty grossly disproportionate to his offense.

*One (1) Charter Arms*, 721 So. 2d at 625 (¶22); *One (1) 1979 Ford*, 721 So. 2d at 636 (¶16).

¶36. After the State rested, Mendez's attorney inquired if the county court would like him to address the caselaw regarding

the nexus between the offense and the property and the extent of the property's role in the offense; the role and culpability of the owner; the possibility of separating the offending property from the remainder; and whether after a review of all relevant facts, the forfeiture divests the owner of the property which has a value that is grossly disproportionate to the crime or grossly disproportionate to the culpability of the owner; as well as another two-part proportionality test, two-prong analysis[.]

The county court judge rejected counsel's offer, stating:

No, I'm not going to listen to you on the *Charter Arms* thing. This is not by proportionality with what he had for personal use in the vehicle. This is about what they say was a drug transaction somewhere else that happened at another time, and the proportionality argument doesn't work at all *because they're not making the claim that it was in proximity to the drugs*.[5] That's the only place that fits. So, no, you can save it now and later. I'm not going to listen to that.

(Emphasis added). Mendez contends that the county court erred in failing to provide an analysis of this two-part test and that the forfeiture in this case is "grossly disproportionate."

---

[5] *See supra* ¶¶30-31.

### A.      The Instrumentality Test

¶37.    Under the first prong, courts determine whether the seized property "possesse[d] a sufficiently close relationship to drug trafficking to justify forfeiture." *Bobo*, 204 So. 3d at 324 (¶28). In *Bobo*, we noted that the State had "presented evidence to the county court to show that Bobo's seized property constituted instrumentalities used in the furtherance of a drug-trafficking operation." *Id*. at 325 (¶31). Likewise, as addressed in Part I of this opinion, we find that the totality of circumstances supports the county court's finding that the State met its burden of proof that the seized funds were a product of or an instrumentality of drug trafficking. *Cf. Lewis v. State*, 199 So. 3d 1245, 1254 (¶30) (Miss. 2016) (finding vehicles were not subject to forfeiture because "no drugs had been found in the trucks, and that there was no evidence of drug transportation").

### B.      The Proportionality Test

¶38.    Under the "proportionality" prong, the "forfeiture of the property must not impose upon the owner a penalty grossly disproportionate to his offense." *Galloway v. City of New Albany*, 735 So. 2d 407, 413 (¶31) (Miss. 1999). As alluded to by the county court judge, had the "offense" for consideration been the misdemeanor charge for possession of marijuana, then we might agree that the forfeiture of the $41,080 was "grossly disproportionate" to that crime. *See One (1) Charter Arms*, 721 So. 2d at 625 (¶27) (Because the claimant "had only one rock of cocaine" on his person and "no prior felony convictions," forfeiture of his vehicle was "grossly disproportionate."). Instead, we are asked to determine

21

whether the forfeiture is "grossly disproportionate" to the "offense" of drug trafficking.

¶39. In *Bobo*, although the claimant argued that the $137,325 discovered by police "came from legitimate business interests," this Court noted that "the State presented evidence at trial to prove otherwise and to refute Bobo's assertion." *Id*. Specifically, officers testifying noted that the bundles of currency "were wrapped in heat-sealed bags, plastic wrap, and dryer sheets," which was "consistent with the techniques used by drug-trafficking organizations." *Id*. Considering those indicators discussed in Part I of this opinion, *see supra* ¶26-27, we determined in *Bobo* that the forfeiture "failed to result in a fine that was grossly disproportionate to [his] culpability." *Id*. at 326 (¶36).

¶40. Similarly, in this case, there was credible testimony by the State's witnesses as to those indicators that support a finding that Mendez was involved in drug trafficking—the recently leased vehicle, the paper tag, the quick turn-around trip along a well-known drug trafficking route, the packaging of the currency, and the K-9's alerting police to the presence of drugs on the currency. Mendez also lied to police about the currency, disavowing any ownership. Accordingly, we conclude that the forfeiture is not "grossly disproportionate."

## CONCLUSION

¶41. Affording deference to the county court's role as fact-finder, we affirm the circuit court's order affirming the county court's ruling that the funds were subject to forfeiture based on the totality of the circumstances.

¶42. **AFFIRMED.**

22

**CARLTON AND WILSON, P.JJ., GREENLEE, McDONALD, LAWRENCE, McCARTY AND SMITH, JJ., CONCUR. WESTBROOKS, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION. EMFINGER, J., NOT PARTICIPATING.**